**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ALBERT KOSTER, EUROBOOR B.V.,** ) | |
| **EUROBOOR USA, INC.,** ) | |
| **EUROBOOR FZC,** ) | |
| ) | |
| **Plaintiffs/Counterclaim Defendants,** ) | |
| ) | **Case No. 2:17-CV-02157-KOB** |
| **v.** ) | |
| ) | |
| **ELENA GRAFOVA** ) | |
| ) | |
| **Defendant/Counterclaim Plaintiff.** ) | |

## <u>MEMORANDUM OPINION</u>

This case contains all the hallmarks of a Hollywood blockbuster: divorce, deception, courtroom drama, and hundreds of thousands of dollars exchanging hands across international borders. Federal courts rarely involve themselves in divorce or family proceedings, but this case more than makes up for the lack of such cases up to this point.

While the divorce action is not pending here, the case before this court stems from the complicated relationship between Albert Koster and Elena Grafova. The two began a romantic relationship, eventually marrying, and quickly thereafter developed a business relationship relating to Mr. Koster's Euroboor entities.

Neither Mr. Koster nor Ms. Grafova heeded the age-old advice to avoid mixing business with pleasure. Both their marriage and their business relationship deteriorated. Mr. Koster and his Euroboor entities sued Ms. Grafova for accessing protected business financial information without authorization, disclosing confidential business data and financial records without authorization, and trespassing Euroboor's chattel relating to Euroboor's computer systems and files. Ms. Grafova countersued Mr. Koster and the Euroboor entities for fraudulent inducement

1

to move to the United States, conversion of her personal belongings, fraudulent inducement to enter into an agreement to loan Euroboor FZC money, and breach of that loan agreement.

Mr. Koster, Euroboor B.V., Euroboor USA, and Euroboor FZC (collectively "Plaintiffs") have filed two motions to dismiss Ms. Grafova's counterclaims. Euroboor B.V., Euroboor USA, and Mr. Koster raise four grounds for the dismissal of Ms. Grafova's counterclaims: (1) the court should dismiss Ms. Grafova's conversion claims under forum non conveniens; (2) the court should dismiss Ms. Grafova's conversion claim under the international abstention doctrine; (3) the court lacks subject matter jurisdiction over Ms. Grafova's fraudulent inducement claims because they are not yet ripe; and (4) Ms. Grafova failed to plead fraud with the particularity required under Federal Rule of Civil Procedure 9(b). (Doc. 68). Euroboor FZC raises three of the same grounds for dismissal—forum non conveniens, ripeness, and Rule 9(b)—and no additional grounds. (Doc. 70).

The parties fully briefed the motions.[1] The motions are now ripe for review. For the reasons discussed below, the court will GRANT IN PART and DENY IN PART Mr. Koster, Euroboor B.V., and Euroboor USA's motion to dismiss, (doc. 68), and will DENY in its entirety Euroboor FZC's motion to dismiss, (doc. 70).

### I. Background

On June 1, 2014, Ms. Grafova entered into an "Employment Contract for an Indefinite Period of Time" with Euroboor B.V. as Marketing Sales Manager of the Eastern European Territories. (Doc. 56 at 4). She worked in the Liedschendam office in The Netherlands. Ms.

---

[1] Plaintiffs attached seven exhibits to their motions to dismiss. In addition to requesting briefing on the motions to dismiss in its briefing schedule, the court also requested that the parties brief whether the court could consider the extrinsic evidence for the Rule 9(b) ground of the motion to dismiss without converting that ground to a motion for summary judgment, which the court will discuss later in this Memorandum Opinion. (Doc. 72 at 5).

Grafova claims she also performed Chief Financial Officer duties as soon as she began working for Euroboor.

On September 26, 2014, Ms. Grafova married Mr. Koster.

Ms. Grafova alleges that Mr. Koster "was looking for cash-flow to operate his family of Euroboor companies" and that he "was aware that Ms. Grafova had substantial independent wealth." (Doc. 56 at 4). In January 2015, Mr. Koster requested that Ms. Grafova provide financial assistance to expand Euroboor. Ms. Grafova agreed to loan Euroboor $175,000 with a 6% interest rate on January 15, 2015. Mr. Koster continued to solicit money from Ms. Grafova, stating that he needed loans "to create cash flow for his family of Euroboor companies." (*Id.* at 5).

After acquiring more loans from Ms. Grafova, Mr. Koster decided to create a Euroboor entity in the United States known as Euroboor USA. Mr. Koster used Gregory Bryant of Bryant Law Group P.C. to apply for a State of Alabama Certificate of Registration for Euroboor USA. Mr. Koster again sought loans from Ms. Grafova. He offered her a 20% ownership stake in Euroboor FZC in addition to 6% interest payments on the money Ms. Grafova had loaned Euroboor in February 2015.[2] In May 2015, Ms. Grafova accepted Mr. Koster's offer and became a 20% shareholder in Euroboor FZC. Later, Ms. Grafova learned that Mr. Koster offered her an ownership interest because "it was a prerequisite to obtaining further loans from her for Euroboor FZC." (Doc. 56 at 6).

---

[2] The court is uncertain whether this February 2015 loan mentioned in the complaint refers to an additional loan Ms. Grafova made after her January 15, 2015 loan. Ms. Grafova does not indicate when she agreed to the additional loans. The counterclaim complaint only references by date a January 15, 2015 loan, not a February 2015 loan.

On June 11, 2015, Euroboor USA received its State of Alabama Certificate of Registration, which authorized Euroboor USA to conduct business in Alabama beginning on August 1, 2015.

Throughout summer 2015, Mr. Koster continued to seek loans from Ms. Grafova to Euroboor FZC. Ms. Grafova alleges that Mr. Koster offered to pay the loaned money back in full and to pay Ms. Grafova quarterly interest payments. In exchange for additional loans, Mr. Koster promised to give Ms. Grafova more management responsibilities at Euroboor, particularly with Euroboor USA. Following this offer, Ms. Grafova made two more loans to Euroboor FZC: $560,000 on September 26, 2015, and $140,000 on December 7, 2015. Both loan agreements stated that Euroboor FZC would make quarterly payments to Ms. Grafova with an interest rate of 6% "over the principal sum and/or the remaining debt" to begin on January 1, 2016, with the repayment of the principal due on December 31, 2019.

In early 2016, Mr. Koster, as President and CEO of Euroboor B.V. and Euroboor USA, suggested that Ms. Grafova become the CFO of Euroboor USA. Mr. Koster told her that Euroboor USA would sponsor her as its CFO for three years and Euroboor B.V. would cover her travel and relocation costs. Ms. Grafova agreed to move to Birmingham, Alabama to work as Euroboor USA's CFO.

In early 2017, Euroboor B.V., Euroboor USA, and Mr. Koster began the process to file a petition to obtain an L-1 work visa for Ms. Grafova. Several months later, Ms. Grafova indicated that she no longer wished to relocate to the United States or to become CFO. Mr. Koster reassured Ms. Grafova that she had the qualifications necessary to serve as CFO, that she could live in the United States for three years, and that Euroboor B.V. would cover her relocation expenses. Ms. Grafova again agreed to move to Birmingham as CFO.

Euroboor USA filed the petition to obtain an L-1 work visa for Ms. Grafova on July 19, 2017. Mr. Koster signed the employer support letter filed with the petition. On September 12, 2017, Ms. Grafova's L-1 work visa was approved. She obtained her visa on October 26, 2017. On October 30, 2017, Ms. Grafova entered the United States on her L-1 visa and began working as Euroboor USA's CFO. Her visa allowed her to remain until September 11, 2020, as long as Euroboor USA employed her as CFO.

Ms. Grafova purchased a home in Birmingham. She packed 35 boxes filled with her belongings at Mr. Koster's home in The Netherlands to be shipped to the United States, which Ms. Grafova alleges were worth over $250,000. Ms. Grafova also left at Mr. Koster's house a motorcycle and its accessories and a Venetian vase, all to be shipped to the United States. Mr. Koster and Euroboor B.V. assured Ms. Grafova that they would ship her belongings to the United States. Ms. Grafova coordinated this shipment with Mr. Koster and "other Euroboor employees, including an employee named 'Dagmar.'" (Doc. 56 at 10). On October 31, 2017, Mr. Koster emailed Ms. Grafova to inform her that her belongings were being shipped and would arrive the next week.

On or around November 6, 2017, Mr. Koster allegedly requested that Ms. Grafova transfer funds from Euroboor FZC to his personal bank account. Ms. Grafova refused. Mr. Koster then cancelled her shipment of boxes. Further, "Mr. Koster immediately thereafter began taking measures that made it difficult for Ms. Grafova to successfully perform her job duties at Euroboor USA, including refusing to provide her an adequate work space." (Doc. 56 at 11).

Ms. Grafova then began to worry that Mr. Koster would not honor her loan agreements. Mr. Koster refused to pay any of the money due to Ms. Grafova under the loan agreements. On November 28, 2017, Ms. Grafova emailed Mr. Koster that she was accelerating the loan

agreements because of the numerous violations of the agreements and non-payment of interest that was due quarterly.

Two days later, Euroboor USA terminated Ms. Grafova as CFO.

Because Ms. Grafova now lacked employment, she hired an immigration attorney to file an application so she could remain in the United States. Ms. Grafova's son, who lives in The Netherlands, met with Mr. Koster to reclaim Ms. Grafova's motorcycle, accessories, and vase. Mr. Koster refused to return the belongings and "violently forced Ms. Grafova's son to leave his home." (Doc. 56 at 13). On December 1, 2017, Mr. Koster told Ms. Grafova that he had recalled her boxes back to The Netherlands.

On December 21, 2017, Euroboor B.V. placed Ms. Grafova on a leave of absence.

On December 22, 2017, Euroboor B.V. and Mr. Koster filed the underlying action against Ms. Grafova.[3] (Doc. 1). They alleged ten causes of action: violation of the Federal Computer Fraud and Abuse Act, violation of Alabama's Digital Crime Act, trespass to chattels, tortious interference with business and contractual relations, defamation and defamation per se, conversion, negligence and wantonness, breach of fiduciary duty and duty of loyalty, fraud, and breach of contract of the relevant employment agreement.

On January 4, 2018, Euroboor B.V. terminated Ms. Grafova's June 1, 2014 indefinite employment agreement. Ms. Grafova disputes the validity of her termination by Euroboor.

Also in January 2018, Ms. Grafova filed for divorce from Mr. Koster in the Rotterdam District Court in The Netherlands. (Doc. 69 at 15).

At some point, Mr. Koster told Ms. Grafova she could pick up her belongings on April 25, 2018. So, Ms. Grafova traveled to The Netherlands and hired movers. The movers delivered

---

[3] Euroboor USA was added as a Plaintiff in the amended complaint filed on October 10, 2018. (Doc. 76).

more than 35 boxes to Ms. Grafova's home. But Ms. Grafova immediately noticed that her most valuable belongings—including expensive clothing, family heirlooms, and art, worth a total exceeding $150,000—were missing. She also noticed that her personal documents, family pictures, and personal diary were missing. Ms. Grafova still has not recovered these belongings.

On August 6, 2018, Ms. Grafova filed an amended counterclaim against Euroboor B.V., Mr. Koster, Euroboor USA, Inc., and Euroboor FZC. (Doc. 56). She alleged four causes of action. Count One alleges that Euroboor B.V., Euroboor USA, and Mr. Koster fraudulently induced Ms. Grafova to move to the United States to work for Euroboor USA. Count Two alleges that Euroboor B.V. and Mr. Koster converted Ms. Grafova's personal belongings. Count Three alleges that Euroboor B.V., Mr. Koster, and Euroboor FZC fraudulently induced Ms. Grafova to secure loans to Euroboor FZC. Count Four alleges that Euroboor FZC and Mr. Koster breached the loan agreement between Euroboor FZC, through Mr. Koster, and Ms. Grafova.

## II. Standard of Review

Mr. Koster, Euroboor B.V., Euroboor USA, and Euroboor FZC raise four arguments why Ms. Grafova's counterclaims should be dismissed: forum non conveniens, the international abstention doctrine, lack of subject matter jurisdiction, and failure to plead fraud with particularity. The court will review the standard for each ground.

### a. Forum non conveniens

The doctrine of forum non conveniens ensures that "the trial is convenient." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981). Generally, the court respects the plaintiff's choice of forum. As the Supreme Court noted, "unless the balance [of public and private interest factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). But the court may, in its

discretion, dismiss the case "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative legal problems.'" *Piper Aircraft Co.*, 454 U.S. at 256 (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).

When a U.S. citizen chooses to sue in the United States, "it is reasonable to assume that this choice is convenient." *Piper Aircraft*, 454 U.S. at 256. When a foreign citizen chooses to sue in the United States, the court gives the claimant's choice of forum less deference. *See id.* ("When the plaintiff is foreign, however, this assumption is much less reasonable. . . . [A] foreign plaintiff's choice deserves less deference.").

To move to dismiss on the basis of forum non conveniens, the party must show "(1) that an adequate alternative forum is available; and (2) that the private and public interest factors weigh in favor of dismissal." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 (11th Cir. 1997). Courts construe adequate alternative forums broadly. "An adequate forum need not be a perfect forum." *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001). The Supreme Court held that an alternative forum is only inadequate when the remedy it provides "is no remedy at all." *Piper Aircraft Co.*, 454 U.S. at 254. "[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district court does not render an alternative forum inadequate." *Satz*, 244 F.3d at 1283 (quoting *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir. 1990)).

Courts have no exhaustive list of factors exists to consider whether an action should be dismissed under forum non conveniens. *See King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1381–

82 (11th Cir. 2009) ("These factors are not exhaustive or dispositive, and courts are free to be flexible in responding to cases as they are presented."). But in *Gilbert*, the Supreme Court provided some factors for courts to consider. *See* 330 U.S. at 508–09. Private interest factors include (1) "the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;" (2) the "possibility of view of premises, if view would be appropriate to the action;" (3) "all other practical problems that make trial of a case easy, expeditious, and inexpensive"; (4) "questions as to the enforceability of a judgment if one is obtained"; and (5) the "relative advantages and obstacles to a fair trial." *Id.* at 508. Public interest factors include (1) "[a]dministrative difficulties . . . for courts when litigation is piled up in congested centers instead of being handled at its origin"; (2) the burden of imposing jury duty "upon the people of a community which has no relation to the litigation"; (3) the benefit of holding a trial in the view of the community "[i]n cases which touch the affairs of many persons"; (4) "a local interest in having localized controversies decided at home"; and (5) avoiding conflict of laws problems. *Id.* at 508–09.

For a motion to dismiss under forum non conveniens, courts are not limited in the types of evidence they may consider without converting the motion to a motion for summary judgment. *See Kolawole v. Sellers*, 863 F.3d 1361, 1370 (11th Cir. 2017) (considering expert testimony in analyzing forum non conveniens); *Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 387 (5th Cir. 1983) (affirming the district court's dismissal for forum non conveniens after reviewing affidavits, deposition testimony, and pleadings).

### b. International abstention doctrine

Generally, a federal court must exercise the jurisdiction conferred upon it. *See Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994) ("Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred upon them." (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))). But the Eleventh Circuit has established principles under which "the prudent and just action for a federal court is to abstain from the exercise of jurisdiction" regarding some private international disputes. *Id.* The three goals of international abstention are (1) international comity, (2) "fairness to litigants," and (3) "efficient use of scarce judicial resources." *Id.*

International comity refers to respecting "the acts of our fellow sovereign nations." *Turner Entm't Co.*, 25 F.3d at 1518. The Supreme Court recognized international comity as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163 (1895).

As noted by the Eleventh Circuit,

[g]eneral comity concerns include: (1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decedent and just.

*Turner Entm't Co.*, 25 F.3d at 1519 (internal citations omitted).

As to fairness to litigants, the court considers "(1) the order in which the suits were filed; (2) the more convenient forum; and (3) the possibility of prejudice to parties resulting from abstention." *Turner Entm't Co.*, 25 F.3d at 1521–22 (internal citations omitted). Generally, "the

court first assuming jurisdiction . . . may exercise that jurisdiction to the exclusion of other courts." *Colo. River Water Conservation Dist.*, 424 U.S. at 818; *cf. Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 318 (1986) ("When as in this case the foreign action is pending rather than decided, comity counsels that priority generally goes to the suit first filed.").

The Eleventh Circuit identified four factors relevant to efficiency of judicial resources: "(1) the inconvenience of the federal forum; (2) the desirability of avoiding piecemeal litigation; (3) whether the actions have parties and issues in common; and (4) whether the alternative forum is likely to render a prompt disposition." *Turner Entm't Co.*, 25 F.3d at 1522 (internal citations omitted).

### c.  Subject matter jurisdiction

Ripeness "raises [a] . . . basic question of jurisdiction that cannot be waived and goes to the very heart of the 'case or controversy' requirement of Article III." *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000); *see also Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) ("Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies and requires us to consider whether a plaintiff's claims are ripe."). Whether an action is a case or controversy is a basic question of subject matter jurisdiction. *See Provident Life & Accident Ins. v. Transamerica-Occidental Life Ins.*, 850 F.2d 1489, 1491 (11th Cir. 1988) ("[T]his court does not have subject matter jurisdiction over the issue presented unless the issue is a 'case or controversy.'"). So, "[a] motion to dismiss the complaint based on ripeness implicates Federal Rule of Civil Procedure 12(b)(1)." *Penn-Star Ins. v. Swords*, No. 4:17-cv-1041-VEH, 2017 WL 4180889, at *2 (N.D. Ala. Sept. 21, 2017); *see also Elend v. Basham*, 471 F.3d 1199 (11th Cir.

2006) (reviewing a district court's decision to dismiss a case for lack of ripeness under Rule 12(b)(1)).

A 12(b)(1) motion to dismiss asserts a facial or factual challenge to subject matter jurisdiction. Such a challenge requires the court to accept the allegations of the complaint as true and "merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." *Id.* For a Rule 12(b)(1) motion that presents a factual challenge to subject matter jurisdiction, the court may consider documents outside the pleadings without converting the motion to a motion for summary judgment. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013).

A court cannot consider extrinsic evidence for a Rule 12(b)(1) motion that presents a facial attack to subject matter jurisdiction. *See Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) (holding that the court cannot consider extrinsic evidence for a Rule 12(b)(1) facial attack on subject matter jurisdiction).

To determine ripeness, the court considers whether the claimant is bringing the action at the correct time. *See Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996) ("When determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action."). Ripeness involves jurisdictional and prudential concerns. "Article III of the United States Constitution limits the jurisdiction of the federal courts to cases and controversies of sufficient concreteness to evidence a ripeness for review. 'Even when the constitutional minimum has been met, however, prudential considerations may still counsel judicial restraint.'"

*Dig. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (quoting *Action All. of Senior Citizens v. Heckler*, 789 F.2d 931, 940 n.12 (D.C. Cir. 1986)). The court must make two determinations in considering ripeness: "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Dig. Props., Inc.*, 121 F.3d at 589.

### d. Failure to plead fraud with particularity

To properly allege fraud, Federal Rule of Civil Procedure 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) serves to "alert[] defendants to the 'precise misconduct with which they are charged' and [to] protect[] defendants 'against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)).

The Eleventh Circuit explained that Rule 9(b) is satisfied if the complaint identifies four pieces of information:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation omitted). And "[t]he plaintiff must allege facts with respect to each defendant's participation in the fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

### III. Discussion

Euroboor B.V., Euroboor, USA, and Mr. Koster challenge Ms. Grafova's counterclaims on four grounds. First, they contend that the court should dismiss Ms. Grafova's conversion claim under forum non conveniens. Second, they contend that the court should dismiss Ms. Grafova's conversion claim under the international abstention doctrine. Third, they contend that the court lacks subject matter jurisdiction to hear Ms. Grafova's fraudulent inducement claims because they are not yet ripe. Fourth, they contend that Ms. Grafova failed to plead fraud with the particularity required pursuant to Rule 9(b).

Euroboor FZC challenges Ms. Grafova's counterclaims on three grounds: (1) forum non conveniens as to all claims; (2) subject matter jurisdiction because the claims are not yet ripe; and (3) failure to plead fraud with the particularity.

The court will discuss each ground raised in turn and will analyze the motions together to the extent that they raise the same grounds for dismissal.

#### a. Forum non conveniens

Euroboor B.V. and Mr. Koster contend that Count One of Ms. Grafova's amended counterclaim, alleging conversion, should be dismissed under forum non conveniens. Euroboor FZC contends that all of Ms. Grafova's claims should be dismissed under forum non conveniens. So because this argument was raised as to all claims, the court will consider whether Ms. Grafova's counterclaim in its entirety should be dismissed under forum non conveniens.

Plaintiffs contend that Ms. Grafova's claims should be brought in The Netherlands or the United Arab Emirates, not the United States. Ms. Grafova maintains that she did not choose to bring suit in the United States; she merely responded to the suit Mr. Koster and Euroboor B.V. brought in the United States. She notes that "[t]he irony of Counterclaim Defendants' arguments

that Ms. Grafova's claims are better off somewhere else is that Ms. Grafova was initially brought before this Court by Koster and Euroboor [B.V.], neither of which reside in, or are licensed to operate in, the United States." (Doc. 78 at 23 (footnote omitted)).

This irony is not lost on the court. Also not lost on the court is Federal Rule of Civil Procedure 13. Rule 13 requires a defendant to raise compulsory counterclaims and allows a defendant to raise permissive counterclaims. Rule 13 permits Ms. Grafova to bring counterclaims against Mr. Koster and his Euroboor entities in this court because they sued Ms. Grafova in this court first. Plaintiffs cannot have it both ways. By deciding to sue Ms. Grafova in the Northern District of Alabama, they opened themselves to counterclaim liability in this court.

But, regardless of the irony, this court is bound to apply the forum non conveniens doctrine as outlined by the Supreme Court and the Eleventh Circuit. For the court to dismiss under forum non conveniens, the movants must show "(1) that an adequate alternative forum is available; and (2) that the private and public interest factors weigh in favor of dismissal." *BCCI Holdings (Luxembourg) S.A.*, 119 F.3d at 951.

First, an adequate alternative forum must exist. An alternative forum is only inadequate when the remedy it provides "is no remedy at all." *Piper Aircraft Co.*, 454 U.S. at 254. Euroboor B.V., Euroboor USA, and Mr. Koster contend that Ms. Grafova could bring her claims in The Netherlands. Euroboor FZC contends that Ms. Grafova could bring her claims in The Netherlands or in the UAE.

Ms. Grafova doubts that she could successfully reinstate her claims in either jurisdiction. She raises the issue of service of process. Euroboor B.V. and Mr. Koster state that they "are amenable to process and subject to jurisdiction in The Netherlands." (Doc. 69 at 7). And Euroboor FZC states that it "would be subject to both process and the jurisdiction of those courts

[in The Netherlands or the UAE]." (Doc. 71 at 8). Ms. Grafova does not believe she could obtain

service of process on Euroboor FZC from The Netherlands because "Euroboor FZC is an entity

in the Emirate of Sharjah in the United Arab Emirates, which is not a member of the Hague

Convention for service of process." (Doc. 78 at 25). But, despite difficulties, Ms. Grafova *was*

able to serve Euroboor FZC in this case. And "some inconvenience or the unavailability of

beneficial litigation procedures similar to those available in the federal district court does not

render an alternative forum inadequate." *Satz*, 244 F.3d at 1283 (quoting *Borden, Inc. v. Meiji

Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir. 1990)). So, given Plaintiffs' statements that they are

*all* subject to jurisdiction in The Netherlands, the court finds that The Netherlands is an adequate

alternative forum.

Second, the court must balance private and public interest factors. Private interest factors

include (1) "the relative ease of access to sources of proof, availability of compulsory process for

attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;" (2) the

"possibility of view of premises, if view would be appropriate to the action;" (3) "all other

practical problems that make trial of a case easy, expeditious, and inexpensive"; (4) "questions as

to the enforceability of a judgment if one is obtained"; and (5) the "relative advantages and

obstacles to a fair trial." *Gilbert*, 330 U.S. at 508.

From the standpoint of accessing proof and witnesses for Ms. Grafova's counterclaims,

the evidence seems to mostly exist in The Netherlands. The court cannot tell where Ms.

Grafova's belongings, which Ms. Koster was supposed to ship to the United States, are currently

located. Plaintiffs allege that the belongings are in The Netherlands, while Ms. Grafova claims

the conversion occurred at a U.S. port. Ms. Grafova's son, who attempted to pick up his mother's

belongings, lives in The Netherlands. The shipment company at issue is a Dutch company. (Doc.

69 at 9). According to Plaintiffs, the loan agreements were signed and executed in the UAE and in The Netherlands. (Doc. 71 at 10).

But Ms. Grafova is currently living in the United States.[4] She cannot read documents in Dutch, so she "would be forced to either endure outrageous translation costs for court filings and other documents or incur confusion and miscommunication with other parties and her counsel in a foreign jurisdiction." (Doc. 78 at 26). She would also need to hire new counsel in The Netherlands. She contends that such excessive costs would also be unfair because she currently has no income after being fired by Euroboor B.V. and Euroboor USA and cannot collect the $700,000 owed to her by Mr. Koster and Euroboor FZC under the loan agreements. Further, to the extent that the documentary evidence of the loan agreements exists in the UAE and in The Netherlands, Ms. Grafova has already included those documents as part of her initial disclosures in this court.

The court must also consider the public interest factors. Public interest factors include (1) "[a]dministrative difficulties . . . for courts when litigation is piled up in congested centers instead of being handled at its origin"; (2) the burden of imposing jury duty "upon the people of a community which has no relation to the litigation"; (3) the benefit of holding a trial in the view of the community "[i]n cases which touch the affairs of many persons"; (4) "a local interest in having localized controversies decided at home"; and (5) avoiding conflict of laws problems. *Gilbert*, 330 U.S. at 508–09.

---

[4] The court can only determine Ms. Grafova's whereabouts as of the day Ms. Grafova filed her response to the motions to dismiss, October 26, 2018. (Doc. 78). Plaintiffs expressed concern that Ms. Grafova may leave the United States because her visa expired. (Doc. 69 at 10). But the court does not know Ms. Grafova's current whereabouts, and so the court must rely on Ms. Grafova's brief that states that she is currently in the United States.

Plaintiffs contend that the public interest factors weigh heavily in favor of dismissing the case. They maintain that, because the action regarding the disputed belonging took place in The Netherlands, Dutch law will apply, thus raising conflict of laws issues. *See Ex parte U.S. Bank Nat'l Ass'n*, 148 So. 3d 1060, 1070 (Ala. 2014) ("Alabama continues to follow the traditional view of the *Restatement (First) of Conflicts of Laws*, . . . which looks to the *lex loci delicti* in tort claims, in the state where the last event necessary to make an actor liable for the alleged tort takes place." (internal citations and quotations omitted)). And the loans at issue are exclusively governed by the laws of the Netherlands.[5] (Doc. 71 at 18, 21). As one district court has recognized, "[i]t would be much more efficient for a court in The Netherlands to resolve such issues that for this court to attempt to guess at the laws of a foreign legal system with which it is unfamiliar." *TH Agric. & Nutrition, L.L.C. v. Ace European Grp. Ltd.*, 416 F. Supp. 2d 1054, 1072 (D. Kan. 2006). Further, Plaintiffs maintain that "there are no significant public interests involved in this dispute." (Doc. 69 at 9).

But Plaintiffs overstate the lack of public interests involved in this dispute. In Count One of her amended counterclaim, Ms. Grafova alleges that Euroboor B.V., Euroboor USA, and Mr. Koster fraudulently induced her to move to the United States to work for Euroboor USA. Surely the United States has an interest in cases involving employers allegedly inducing individuals to work for their companies under the guise of obtaining a visa to move to the United States. As to the burden of imposing jury duty "upon the people of a community which has no relation to the

---

[5] As discussed previously in this Memorandum Opinion and the court's order setting a briefing schedule, this court can consider the loans attached to the motion to dismiss under forum non conveniens without converting the motion into a motion for summary judgment. *See Kolawole v. Sellers*, 863 F.3d 1361, 1370 (11th Cir. 2017) (considering expert testimony in analyzing forum non conveniens); *Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 387 (5th Cir. 1983) (affirming the district court's dismissal for forum non conveniens after reviewing affidavits, deposition testimony, and pleadings).

litigation," Plaintiffs have already thrust this burden upon the Northern District of Alabama by filing suit against Ms. Grafova here. And the court agrees with Ms. Grafova that leaving her counterclaim to proceed before this court would conserve time and judicial resources, in addition to promoting finality and consistency that would be difficult to achieve if this case proceeds in different courts across the globe simultaneously.

After balancing the private and public interest factors, the court finds that this case should not be dismissed under forum non conveniens. The court will DENY Plaintiffs' motions to dismiss as to this ground.

### b. International abstention doctrine

Euroboor B.V., Euroboor USA, and Mr. Koster contend that Ms. Grafova's conversion claim should be dismissed under the international abstention doctrine "because it is duplicative of her claims that are already being adjudicated in the divorce proceeding in the Netherlands." (Doc. 69 at 13).

While generally a federal court must exercise the jurisdiction conferred upon it, the international abstention doctrine allows courts to abstain from jurisdiction when a pending case exists before an international tribunal. *See Turner Entm't Co.*, 25 F.3d at 1518. The three goals of international abstention are (1) international comity, (2) "fairness to litigants," and (3) "efficient use of scarce judicial resources." *Id.*

Here, a related case exists in The Netherlands regarding Mr. Koster and Ms. Grafova's divorce. (Doc. 69 at 34–41). Euroboor B.V., Euroboor USA, and Mr. Koster attached to their motion to dismiss a March 20, 2018 court order from "District Court The Hague," case number

C/09/546895.[6] In that case, Ms. Grafova sought "a preliminary spousal maintenance of £ 7,000 gross per month to be paid by the husband to the wife, always payable in advance;" and a determination "that the husband must hand over the goods specified by the wife within fourteen days after the issue of the court order." (Doc. 69 at 34). The goods Ms. Grafova sought to have turned over appear to be the same possessions that Mr. Koster was supposed to ship to Ms. Grafova in the United States. That court ultimately dismissed Ms. Grafova's request for the court to determine a preliminary spousal maintenance and to determine that Mr. Koster must hand over the goods specified by her.

"The doctrine of international comity can be applied retrospectively or prospectively. When applied retrospectively, domestic courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004). When applying the doctrine retrospectively, the court must consider three factors:

> (1) whether the foreign court was competent and used "proceedings consistent with civilized jurisprudence," (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just."

*Id.* (quoting *Turner Entm't Co.*, 25 F.3d at 1519). And the court "also consider[s] whether the central issue in dispute is a matter of foreign law" and the potential for conflicting judgments. *Id.*

Ms. Grafova does not argue that the Dutch court was incompetent, that the judgment was rendered by fraud, or that the judgment was prejudicial. Instead, she argues that the international abstention doctrine is inapplicable here because the divorce proceeding is not parallel to the

---

[6] As discussed previously in the court's order setting a briefing schedule, this court can consider the court order attached to the motion to dismiss under the international abstention doctrine without converting the motion into a motion for summary judgment. (Doc. 72 at 2–3).

proceeding before this court for three reasons: (1) different parties were involved in each dispute, (2) the gravamens of the complaints were different, and (3) different remedies were sought.

First, Ms. Grafova notes that different parties were involved. Only Ms. Grafova and Mr. Koster were parties to the divorce proceeding. On the other hand, this case also implicates three Euroboor entities, and Ms. Grafova claims that two parties—Mr. Koster and Euroboor B.V.— should be held liable for the conversion claim.

Second, Ms. Grafova notes that the Dutch court order involved Ms. Grafova's request that Mr. Koster hand over her belongings, but the court does not mention what, if any, evidence was heard in the divorce proceeding regarding conversion. Third, Ms. Grafova merely requested the return of her possessions in the divorce proceeding. Now, Ms. Grafova seeks damages for the conversion of her possessions.

But Ms. Grafova cannot bounce from jurisdiction to jurisdiction seeking different remedies for the same claim. Ms. Grafova sought the return of her belongings from Mr. Koster in the Dutch court. The Dutch court noted the following regarding Ms. Grafova's possessions:

> It turned out at the hearing that the parties agreed that the wife will come to the Netherlands and that she will instruct the moving company Van der Velde 't Veentje to pick up the wife's boxes with possessions at the husband['s residence]. The husband promised to make the boxes available to the moving company. As soon as the boxes are at the moving company, the wife will check whether all her possessions are in the boxes and she will take care of further handling. The wife promised to pay the costs of the moving company.

(Doc. 69 at 37).

To this court, it seems that the dispute over Ms. Grafova's belongings ended amicably in the Dutch court. And to the extent that the dispute was not successfully resolved, Ms. Grafova should have appealed the order or sought enforcement of the order in the Dutch court. But suing Mr. Koster and Euroboor B.V. in the United States for the *same* conduct regarding the *same*

belongings would inevitably end in a judgment that is at best duplicative, and at worst contradictory, to the Dutch judgment.

So, the court will GRANT Mr. Koster, Euroboor B.V., and Euroboor USA's motion to dismiss Ms. Grafova's conversion counterclaim under the international abstention doctrine. The court will DISMISS Ms. Grafova's counterclaim for conversion.

### c. Ripeness

Euroboor FZC and Mr. Koster contend that the court should dismiss Ms. Grafova's claims for fraudulent inducement to secure the loan, Count Three, and breach of contract, Count Four, because those claims are not yet ripe. To determine whether a claim is ripe, the court must make two determinations: "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Dig. Props., Inc.*, 121 F.3d at 589.

As a preliminary issue, the court must determine whether it can consider the exhibit attached to the motion to dismiss regarding ripeness without converting the motion to a motion for summary judgment. As explained in this court's briefing schedule, Plaintiffs made factual challenges to the ripeness of Ms. Grafova's counterclaims. (Doc. 72 at 2). In a factual challenge to subject matter jurisdiction, the court may consider documents outside the pleadings without converting the motion to a motion for summary judgment. *See Houston*, 733 F.3d at 1335–36. So, the court can consider Exhibit 1, the loan agreements, offered by Plaintiffs in support of their ripeness argument.

The court will analyze whether each claim is ripe separately.

### i. Breach of contract

Euroboor FZC and Mr. Koster argue that Ms. Grafova has not yet been injured because the full repayments of the loans are not due until December 31, 2019. Ms. Grafova points out

that under the loan agreements, the interest was payable beginning January 1, 2016, and

Euroboor FZC and Mr. Koster have never paid interest under the loan agreements. She also

contends that the loan agreements contain a provision ordering immediate repayment of the debt

if certain scenarios have occurred, and so immediate repayment would be appropriate here.

Euroboor FZC and Mr. Koster argue that the unpaid interest "does not trigger an acceleration

clause or provide a cause of action for breach." (Doc. 71 at 7). Instead, they suggest that the

unpaid interest is merely added to the principal, which all becomes due on December 31, 2019.

The two loan agreements are virtually identical in their terms. Under Article 2, Interest,

the agreements state that "[t]he interest is payable quarterly, commencing on January 1, 2016,"

but "to the extent that the interest has not been paid, the interest shall be added to the principal

sum and shall be interest-bearing." (Doc. 69 at 22, 25). Article 3, Repayment, clearly states that

"[r]epayment of the principal sum shall take place on December 31, 2019." (*Id.*). And Article 4

lists six scenarios in which immediate repayment and penalties are "possibly due without notice

if the creditor so requires." (*Id.*). The scenarios include:

> a. declaration of bankruptcy of debtor;
> b. submission of an application for a suspension of payments of debtor;
> c. confiscation of all or part of the assets of debtor;
> d. dissolution of debtor;
> e. if debtor fails to fulfil or violates any article within this agreement, without prejudice to that stipulated in sub 2 of this article;
> f. if debtor increases indebtedness by borrowing funds from a bank and/or from third parties, without prior written consent by creditor . . . .

(*Id.* at 22–23, 25–26). Subsection 2 of Article 4 states:

> The party that breaches any provision of this agreement[] forfeits an immediately due and payable penalty to the amount of [$5,000] . . . per occurrence, without injunction or proof of default is [sic] required, irrespective of the right of the other party to demand full compensation, the right to cancel this agreement and the right to desire fulfilment of this agreement.

(*Id.* at 23, 26).

Ms. Grafova contends that two scenarios have occurred that entitle her to immediate repayment of the principal. First, under subpart (e), she claims that Euroboor FZC has failed to pay the interest due quarterly under Article 2, thus failing to fulfil or violating an article within the loan agreements. And, even if violation of this subpart does not trigger immediate repayment, it at least triggers "an immediately due and payable penalty to the amount of [$5,000]." Euroboor FZC argues that failure to pay interest quarterly is *not* a breach because of the savings clause, which adds unpaid interest to the principal, allowing Euroboor FZC to "elect to pay interest *on the interest*, the sum total of which is added to the principal and due December 31, 2019." (Doc. 79 at 4).

The court cannot believe that Article 2 details the *optional* unilateral payment of interest. While the loan agreements clearly state that unpaid interest shall be added to the principal sum, and then become interest-bearing, the debtor still plausibly violated the agreement by not paying the interest as directed in subsections 2.1 and 2.2 in the first place. And Article 4 considers the possibility of such a violation, stating that a failure to fulfil or violation of *any* article of the loan agreement can trigger immediate repayment without prejudice to the penalty clause in subpart 4.2. Subpart 4.1(e) does *not* say that failure to fulfil or violate any article within this agreement *except for failure to pay interest under Article 2* triggers immediate repayment. Euroboor FZC argues that to allow failure to pay interest to trigger immediate repayment under 4.1(e) would render null subpart 2.3, which provides that unpaid interest shall be added to the principal sum. But Subpart 2.3 would still have effect—the unpaid interest would be added to the principal sum, but the alleged violation also would trigger the immediate repayment and penalties listed in Article 4.

Second, under subpart (b), Ms. Grafova contends that Euroboor FZC has submitted an application for a suspension of its payments. She states that the only payments contemplated by the loan agreements were the quarterly interest payments, and so "[Mr.] Koster and Euroboor FZC's documented refusal to make interest payments are the only payments that could constitute a clear 'suspension of payments of debtor.'" (Doc. 78 at 11–12). Euroboor FZC maintains that "[a]n application for suspension of payments (*surseance van betaling*) is a specific legal remedy under the Dutch Bankruptcy Act . . . that concerns an application filed by the debtor with a Dutch Court by a Dutch attorney." (Doc. 79 at 4–5). And, as previously stated, the loan agreements are exclusively governed by the law of The Netherlands. (Doc. 69 at 23, 26).

The court agrees with Euroboor FZC's reading of the clause. Even reading subpart 4.1(b) without a familiarity with Dutch law, a plain reading of the subpart brings to mind an *application* to suspend payments, like relief sought in an American bankruptcy court. Ms. Grafova has presented no evidence that Mr. Koster or Euroboor FZC applied to suspend their payments, only that they did not pay. So, the court cannot find a violation of 4.1(b) that would bring about immediate repayment or penalty.

Ms. Grafova has already suffered an alleged harm under the breach of contract claim: she is owed interest which has not been paid over the past two and a half years. So, her claim is fit for review—she has and is currently suffering harm—and she will suffer continued hardship if her claim is not heard as the unpaid interest accumulates. So, her breach of contract claim is ripe.

### ii. Fraudulent inducement

Euroboor FZC and Mr. Koster again argue that Ms. Grafova has not yet been injured because the full repayment of the loans is not due until December 31, 2019. But Ms. Grafova argues that, regardless of when the repayment is due, fraudulent inducement creates harm

different than that cause by breach of contract. She contends that Plaintiffs "confuse a sufficient condition (i.e. money owed under the loan agreements) with a necessary condition (i.e. a fraudulent representation induced behavior on behalf of plaintiff that resulted in harm to plaintiff) to bring forth this challenge." (Doc. 78 at 13).

The court first considers what a claimant is required to prove to bring a fraudulent inducement claim under Alabama common law. The elements of fraud include "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) (emphasis omitted). "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000). So, to present a claim for fraudulent inducement, the party must prove "damage occurring as a result of the reliance." *S. Energy Homes, Inc. v. AmSouth Bank of Ala.*, 709 So. 2d 1180, 1186 (Ala. 1998).

Ms. Grafova does not explain what the suffered harm of the fraudulent inducement claim is, other than that Plaintiffs' argument that this claim is not ripe "fails for [the] same reasoning above that the breach of contract claim is ripe." (Doc. 78 at 13). So the court assumes that Ms. Grafova's alleged suffered harm is the lack of interest payments owed to her. As the court previously stated in the breach of contract analysis, failure to pay interest is still a breach of contract under these loan agreements. As such, Plaintiffs' failure to pay interest due under the loans resulted in damage to Ms. Grafova.

Ms. Grafova's claim for fraudulent inducement seeks redress for a continuing harm: failure to receive any interest payments under the loan agreements. So, her claim is fit for review—she has and is currently suffering harm—and she will suffer continued hardship if her claim is not heard as the unpaid interest accumulates. So, her fraudulent inducement claim is ripe.

Plaintiffs do, at some point, conflate *standing* requirements with *ripeness* requirements. The Eleventh Circuit notes that such confusion is common: "The confusion in the law of standing and ripeness is hardly surprising. Both doctrines focus initially on the injury to the person bringing the action." *Wilderness Soc.*, 83 F.3d at 390. While related doctrines, ripeness refers to the timing of the case, while standing refers to whether the proper claimant is bringing the suit. *See id.* ("When determining standing, a court asks whether these persons are the proper *parties* to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered harm. When determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action." (internal citation omitted)).

To have standing to raise a claim in federal court, a claimant must have suffered an injury in fact, "which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal citations omitted). To the extent Plaintiffs argue that Ms. Grafova has not suffered a concrete and particularized, actual injury, the court finds that the alleged failure to receive quarterly interest payments over a period of two and a half years—if proven—is undeniably concrete, particularized, and actual.

Therefore, the court will DENY Plaintiffs' motions to dismiss based upon ripeness.

#### d. Failure to plead fraud with particularity

Mr. Koster, Euroboor B.V., and Euroboor USA allege that Ms. Grafova failed to plead fraudulent inducement with particularity, as required by Federal Rule of Civil Procedure 9(b), in Counts One and Three, and so the court should dismiss those counts. Euroboor FZC also alleges that Ms. Grafova failed to plead fraudulent inducement with particularity in Count Three.

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Eleventh Circuit explained what a complaint could contain to satisfy Rule 9(b):

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Brooks*, 116 F.3d at 1371 (internal quotation omitted). The court will analyze separately Count One and Count Three to determine whether Ms. Grafova has pled her claims with the requisite particularity.

But before the court can reach the merits of this argument, the court must determine whether it can consider the documents attached to Plaintiffs' motions to dismiss. Mr. Koster, Euroboor B.V., and Euroboor USA attached four exhibits related to their Rule 9(b) challenge: (1) the Memorandum and Articles of Association of Euroboor FZC, (2) the U.S. Department of Homeland Security's visa for a nonimmigrant worker, (3) a document titled "Action by Unanimous Written Consent in lieu of 2017 Special Meeting of the Shareholder [sic] of Euroboor USA, Inc." that terminated Ms. Grafova, and (4) a letter to Ms. Grafova from Euroboor

USA notifying her of her termination. Euroboor FZC attached one exhibit related to its Rule 9(b) challenge: the Memorandum and Articles of Association of Euroboor FZC.

A Rule 9(b) challenge is generally raised as part of a Rule 12(b)(6) argument for failure to state a claim upon which relief can be granted. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1300 (4th ed. 2018) (noting that because Rule 9(b) does not "authorize a motion for its enforcement," a motion to dismiss under Rule 9(b) is asserted as part of a Rule 12(b)(6) motion to dismiss). In its briefing schedule order, the court questioned whether this challenge was improperly labeled as a Rule 9(b) motion and whether it should instead be considered as a motion for summary judgment. Rather than arguing that Ms. Grafova failed to allege facts with particularity, Plaintiffs contended that Ms. Grafova's assertions were false based upon her knowledge as evidenced by the attached exhibits, which to the court seemed more appropriate as a motion for summary judgment. (Doc. 72 at 4–5). But because Plaintiffs argue that Ms. Grafova failed to satisfy Rule 9(b) as part of their motions to dismiss, and not as part of a motion to strike or a motion for more definite statement, the court assumes that this Rule 9(b) challenge is also raised as part of a 12(b)(6) motion.

Further, the court generally cannot consider documents outside the pleadings in a Rule 12(b)(6) motion to dismiss without converting the motion to one for summary judgment under Rule 12(d). *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The court may consider certain documents without converting a Rule 12(b)(6) motion to dismiss to a motion for summary judgment. For example, the court can consider attached documents that are "(1) central to the plaintiff's claim and (2) undisputed," as well as exhibits attached to the complaint. *Day v. Taylor*, 400 F.3d 1272,

1276 (11th Cir. 2005) (finding a document central when "the document's contents [were] alleged in a complaint and no party question[ed] those contents"). In this case, Ms. Grafova attached no documents to her amended counterclaim. She does reference her L-1 work visa multiple times. (Doc. 56 at 2, 8–10). Her visa is central to her counterclaim alleging fraudulent inducement to work in the United States, and neither party disputes the authenticity or contents of the visa. So the court can consider Ms. Grafova's L-1 visa attached to the motion to dismiss.

Ms. Grafova also generally references her termination, which is described by the "Action by Unanimous Written Consent in lieu of 2017 Special Meeting of the Shareholder [sic] of Euroboor USA, Inc." and the letter from Euroboor USA terminating her. But Ms. Grafova does not specifically reference either of these documents or Euroboor FZC's articles of association in her complaint. The court doubts that any of these documents are central to Ms. Grafova's complaint. These documents have no bearing on Ms. Grafova's conversion, fraudulent inducement to secure loans, or breach of loan agreement claims. At most, the shareholders' meeting notes and the termination letter could relate to Plaintiffs' defense to Ms. Grafova's claim for fraudulent inducement to work in the United States. But regardless, such documents are not central to that claim. And to the extent Plaintiffs attached these exhibits to contradict Ms. Grafova's allegations, such an argument is fit for summary judgment, *not* a motion to dismiss. The court does not determine factual issues in a 12(b)(6) motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true . . . ." (internal citations omitted)). So the court will exclude the shareholders' meeting notes, the termination letter, and the articles of association.

### i. Fraudulent inducement to move to the United States

In her amended counterclaim, Ms. Grafova alleges that Euroboor B.V., Euroboor USA, and Mr. Koster made various false misrepresentations, knowing that Ms. Grafova would trust them. In early 2016 until she agreed to move, Ms. Grafova alleges that Mr. Koster (1) approached her to suggest she go to the United States and become CFO of Euroboor USA, (2) represented to her that "she had the business capabilities to help Euroboor USA reach its full potential," (3) represented that Euroboor USA would sponsor her as CFO for three years, (4) that she could "grow Euroboor USA in the United States and take ownership for its success," (5) that this job would allow Ms. Grafova to reside in the United States for at least three years, and (6) that Euroboor, B.V. would cover Ms. Grafova's travel and relocation costs. (Doc. 56 at 7–8). Ms. Grafova claims that she "reasonably relied on the false misrepresentations of Euroboor [B.V.], Euroboor USA, and Mr. Koster that she would have an opportunity as Chief Financial Officer of Euroboor USA to grow the company in the United States and take ownership for its success." (*Id.* at 16).

Mr. Koster, Euroboor USA, and Euroboor B.V. argue that Ms. Grafova has "failed to identify a single affirmative misrepresentation by date, place, or speaker . . . [in addition to] the substance of any misrepresentations." (Doc. 69 at 16). They also contend that Ms. Grafova failed to allege what Plaintiffs gained from the fraud. Finally, they dispute that Ms. Grafova was actually misled, noting that she did receive an L-1 visa and was a director of Euroboor USA for a period of time.

By arguing that Ms. Grafova was not actually misled, Mr. Koster, Euroboor USA, and Euroboor B.V. conflate the essence of Rule 9(b) with a motion for summary judgment. A motion to dismiss under Rule 9(b) only considers whether Ms. Grafova has alleged sufficient facts to put

the Plaintiffs on notice of her claims against them. *See Durham*, 847 F.2d at 1511 (11th Cir. 1988) (noting that Rule 9(b) exists to "alert[] defendants to the 'precise misconduct with which they are charged'" (quoting *Seville Indus. Mach. Corp.*, 742 F.2d at 791)). If Mr. Koster, Euroboor USA, and Euroboor B.V. wish to contest the allegations by presenting evidence, then a motion for summary judgment may be appropriate, but only if no genuine issue of material fact exists. *See* Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

In their motion, Mr. Koster, Euroboor USA, and Euroboor B.V. also argue that Ms. Grafova's claim is barred under Rule 9(b) because she was an at-will employee. Again, such an argument is *not* a Rule 9(b) argument, but a motion for summary judgment argument, assuming no dispute of material fact exists as to Ms. Grafova's employment status.

While *Brooks* set out a complaint that would satisfy Rule 9(b)—"precisely what statements were made," "the time and place of each such statement and the person responsible for making . . . same," "the contents of such statements," and "what the defendants 'obtained as a consequence of the fraud'"—other allegations also satisfy Rule 9(b). *Brooks*, 116 F.3d at 1371 (quoting *Fitch v. Randor Indus., Ltd.*, No. 90-2084, 1990 WL 150110, at *2 (E.D. Pa. Sept. 27, 1990)); *see also Durham*, 847 F.2d at 1512 ("[A]lternative means are also available to satisfy the rule."). For example, in *Durham*, the Eleventh Circuit held that the allegations of the amended complaint with an affidavit from the appellee stating that the defendants corresponded with investors by mail were sufficient to satisfy Rule 9(b) for a mail fraud claim. 847 F.2d at 1512. And the Northern District of Alabama has held expressly that "a plaintiff does *not* need to prove 'what the defendants obtained as a consequence of fraud.'" *Sirmon v. Wyndham Vacation*

*Resorts, Inc.*, No. 7:10-cv-2717-LSC, 2012 WL 13020303, at *3 (N.D. Ala. Apr. 17, 2012) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)).

Ms. Grafova identifies in general terms five false statements made by Mr. Koster in early 2017 that she alleges fraudulently induced her to come to the United States. She does not allege what dates the statements were made, how the statements were made, or what specific words were used. While the exact statements, time, place, and manner of statement are not required, they help put the defendant on notice of the alleged fraudulent conduct. Ms. Grafova was able to allege a general time period, who made the statements, and what statements were made—even though she did not use the precise language.

Ms. Grafova notes that she "made these detailed allegations on August 7, 2018 without the benefit of her Euroboor email account, which was cut off by Euroboor and Euroboor USA upon her firings or any discovery having been conducted in this lawsuit." (Doc. 78 at 19 n.12). The Eleventh Circuit recognizes that "Rule 9(b)'s heightened pleading standard may be applied less stringently . . . when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control.'" *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1040, 1052 (S.D. Ga. 1990), *reconsideration granted*, 755 F. Supp. 1055, 1058–59 (S.D. Ga. 1990)). So the court cannot expect Ms. Grafova to recall the exact words Mr. Koster used three years ago without the ability to refer back to some of their communications.

Thus, the court finds that Ms. Grafova pled fraudulent inducement to move to the United States with the requisite specificity, so it will DENY the motion to dismiss as to fraudulent inducement to move to the United States.

### ii. Fraudulent inducement to secure loans

Ms. Grafova alleges that Mr. Koster misrepresented to her that he would pay all interest and other amounts due to her under the loan agreement. She claims that she relied on these misrepresentations, making two loans in 2015 worth a total of $700,000 to Euroboor FZC. As President and CEO of Euroboor USA and Euroboor B.V., and as Director and controlling shareholder of Euroboor FZC, "Mr. Koster had access to the three companies' financial standing and the necessary control to ensure the companies performed on the loan agreements." (Doc. 56 at 19). Ms. Grafova alleges that Mr. Koster began to request her financial help in January 2015, offering a 6% interest rate, until she entered into the loan on January 15, 2015. She alleges that he offered her a 20% ownership stake in Euroboor FZC to make additional loans, and that she was made a 20% shareholder in May 2015. She claims that Mr. Koster also represented that she "would be able to take on more management responsibility with his family of Euroboor entities, especially Euroboor USA" if she loaned additional money. (Doc. 56 at 6–7).

Plaintiffs allege that Ms. Grafova could not have reasonably relied on their representations because she was a 20% shareholder in Euroboor FZC and CFO of Euroboor, B.V. when she entered into the loans. Therefore, they argue, she had access to the entities' records and accounts. And, according to her counterclaim, she had the ability as of November 6, 2017, to refuse to transfer funds from Euroboor FZC to Mr. Koster.

Plaintiffs' arguments are more akin to general Rule 12(b)(6) arguments than to true Rule 9(b) arguments. Instead of arguing that Ms. Grafova's counterclaim lacked specificity, they

contend that Ms. Grafova could not have reasonably relied on the representations made given her employment status in the Euroboor entities. But again, a factual dispute is not a Rule 9(b) argument. Rule 9(b) ensures that a defendant has particular notice of the fraud claims alleged against him. Like Ms. Grafova's claim for fraudulent inducement to move to the United States, she again alleges who made the purported misrepresentations, the time period during which the misrepresentations were made, and specifics of the misrepresentations—although again, not the exact words used. The court finds that Plaintiffs had noticed of her claim for fraudulent inducement to enter into the loan agreements.

So, the court will DENY the motions to dismiss based upon failure to plead with particularity under Rule 9(b).

## IV. Conclusion

For the reasons discussed above, the court will GRANT IN PART and DENY IN PART Mr. Koster, Euroboor B.V., and Euroboor USA's motion to dismiss. (Doc. 68). The court will GRANT the motion to dismiss Ms. Grafova's conversion counterclaim under the international abstention doctrine and will DISMISS Ms. Grafova's counterclaim for conversion. The court will DENY the motion to dismiss on the grounds of forum non conveniens, ripeness, and failure to plead fraud with particularity.

The court will DENY Euroboor FZC's motion to dismiss in full. (Doc. 70). The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 15th day of May, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE