FILED

2021 Sep-23  PM 03:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **EUROBOOR B.V. and** | ) |
| **ALBERT KOSTER, et al.,** | ) |
| | ) |
| **Plaintiffs/Counterclaim Defendants,** | ) |
| | ) |
| **v.** | )   **Case No. 2:17-cv-02157-KOB** |
| | ) |
| **ELENA GRAFOVA,** | ) |
| | ) |
| **Defendant/Counterclaim Plaintiff.** | ) |

**MEMORANDUM OPINION**

This case—which the court previously referred to as containing "all the hallmarks of a Hollywood blockbuster"—returns to the court for its sequel after an intermission of over two years. (Doc. 88 at 1). During that time, the parties engaged in discovery, and now they both ask the court to end the show early through motions for summary judgment. Defendant Elena Grafova also wants the court to only consider certain parts of the show before giving its final "review;" in other words, she has moved to strike certain affidavits put forth by the Euroboor Plaintiffs.

If the court had any say in the Academy Awards, the underlying story of this case would certainly qualify for an Oscar in a new category: "Best Cautionary Tale about Mixing Romance and Business." Plaintiff Albert Koster and Defendant Elena Grafova were once business associates, and they were also married. Grafova loaned substantial funds—around $700,000—to Koster's business. But both the business and the romance went south in 2017, shortly after Ms. Grafova moved to the United States and announced her intent to divorce Mr. Koster. The blockbuster events that followed—alleged fraud, scathing emails, defaulted loans, and corporate collapse—led to this lawsuit and several others in at least three countries. Here, Plaintiffs allege

that Ms. Grafova's actions related to the business constituted fraud, computer crimes, interference with business relations, and defamation, among other claims. Ms. Grafova alleges that Plaintiffs breached contracts, committed fraud, and converted her property, among other claims. Before the court are the parties' cross-motions for summary judgment, as well as Ms. Grafova's motion to strike the affidavits of two witnesses.

For the reasons discussed below, the court rules as follows. The court will **DENY** Ms. Grafova's motion to strike. (Doc. 213). The court will **GRANT IN PART** and **DENY IN PART** Defendant/Counterclaim Plaintiff Elena Grafova's motion for partial summary judgment (docs. 197, 203). The court will **GRANT IN PART** and **DENY IN PART** the motion for partial summary judgment filed by Plaintiffs/Counterclaim Defendants Euroboor B.V., Euroboor USA, and Albert Koster (doc. 199). Finally, the court will **GRANT IN PART** and **DENY IN PART** Counterclaim Defendant Euroboor FZC's motion for partial summary judgment (doc. 201).

## I.    Motion to Strike

For the sake of clarity, the court will begin its analysis with Ms. Grafova's motion to strike (doc. 213) to ensure that the court considers only appropriate facts set out in its factual narrative in ruling on the motions for summary judgment.

Ms. Grafova moved to strike the affidavits of Tulsidas Gawande (doc. 208-8) and Rehman Shahzad (doc. 208-18) under Fed. R. Civ. P. 56(c)(4). That rule sets out the requirements for affidavits: (1) an affidavit must be based on "personal knowledge;" (2) it must "set out facts that would be admissible in evidence;" and (3) must "show that the affiant . . . is competent to testify on the matters stated."

Mr. Koster and the Euroboor entities rely on the affidavits of Messrs. Gawande and Shahzad in their argument requesting summary judgment on Ms. Grafova's veil-piercing

allegations. *See, e.g.*, (doc. 199-1 at 7–8). Messrs. Gawande and Shahzad testified in their affidavits that each of the Euroboor entities operate independently of Mr. Koster; they testified, for example, that each Euroboor entity files its own tax returns and maintains its own books and financial statements. (Doc. 208-8 at 3; 208-18 at 3).

But, according to Ms. Grafova, Mr. Gawande does not have personal knowledge as to the operations of Euroboor FZC because his "employment with Euroboor FZC ceased in early 2019." (Doc. 213 at 2). Ms. Grafova likewise claims that Mr. Shahzad does not have personal knowledge as to the operations of the other Euroboor entities because he "resigned from Euroboor FZC on January 26, 2019," ten months before he executed his affidavit. (Doc. 213 at 4). Ms. Grafova produced a resignation letter in which Mr. Shahzad purportedly resigned his employment from Euroboor FZC in January 2019. (Doc. 213 at 15).

But, as the Euroboor Plaintiffs point out, Ms. Grafova has only shown that Mr. Gawande transferred his *visa sponsorship* from Euroboor FZC to MEEBS, another entity associated with Mr. Koster that is not before this court. (Doc. 224 at 2; doc. 213 at 8, 10). Additionally, an email Ms. Grafova produced from Mr. Gawande shows that Mr. Gawande—as late as September 2020—still identified as an employee of Euroboor FZC. (Doc. 213 at 12–13). Accordingly, Ms. Grafova has not shown that Mr. Gawande does not have personal knowledge of the operations of Euroboor FZC at the relevant time.

As to Mr. Shahzad's affidavit, Mr. Koster subsequently filed an affidavit confirming that Mr. Shahzad still serves as the CFO of the Euroboor entities as of December 2020, regardless of the resignation letter produced by Ms. Grafova. (Doc. 224-1 at 2–3).

The court concludes that Ms. Grafova's motion to strike really goes to the *credibility and weight* of Messrs. Gawande and Shahzad's affidavits, given the conflicting evidence as to their

3

employment status with the Euroboor entities. But courts may not weigh the evidence or make credibility determinations at the summary judgment stage. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)).

And courts in the Eleventh Circuit generally only strike affidavits for lack of personal knowledge when the *face of the affidavit* shows that the affiant lacks personal knowledge as to the subject matter of his testimony; an affiant generally evidences his lack of personal knowledge through the use of words such as "based on my information and belief." *See, e.g.*, *Prowell v. Ala. Dep't of Human Res.*, No. 2:10-cv-1993-VEH, 20120 WL 3848667, at *4 (N.D. Ala. Sept. 5, 2012) (citing *Robbins v. Gould*, 278 F.2d 116, 118 (5th Cir. 1960)).

On the other hand, courts in the Eleventh Circuit generally *deny* motions to strike when a movant bases its motion on nothing more than a question of the credibility of the affiant. *See, e.g.*, *Ultimax Transp. v. Brit. Airways, Inc.*, 231 F. Supp. 2d 1329, 1335 (N.D. Ga. 2002) (the "objection relates solely to the credibility of the affiant and the weight that the testimony should be given, and does not provide a basis for striking the affidavit from the record").

So the court will **DENY** Ms. Grafova's motion to strike the affidavits of Messrs. Gawande and Shahzad (doc. 213) and will leave the question of their credibility to the jury. But the court will consider their testimony for summary judgment purposes.

In a related vein, Ms. Grafova also asks the court to disregard the affidavit of Kristy Abraham, a Euroboor USA employee. (Doc. 225 at 3). According to Ms. Grafova, Ms. Abraham's affidavit is "inconsistent with" her prior deposition testimony. (Doc. 225 at 3 n.14). And Ms. Grafova is correct that the law of "[t]he Eleventh Circuit, *in limited circumstances*, allows a court to disregard an affidavit as a matter of law when, without explanation, it *flatly*

*contradicts* his or her own prior deposition testimony *for the transparent purpose* of creating a genuine issue of material fact where none existed previously." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) (emphasis added).

But Ms. Grafova has not pointed to any portions of Ms. Abraham's affidavit that "flatly contradict" her deposition testimony; nor has Ms. Grafova shown that the Euroboor Plaintiffs produced Ms. Abraham's affidavit "for the transparent purpose of creating a genuine issue of material fact where none previously existed." *See Furcron*, 843 F.3d at 1306. And the court has conducted its own independent review of Ms. Abraham's deposition (doc. 205-8) and her affidavit (doc. 220-2) and concludes that any discrepancies between the two again "relate[] solely to the credibility of the affiant and the weight that the testimony should be given, and do[] not provide a basis for striking the affidavit from the record." *See Ultimax Transp. v. Brit. Airways, Inc.*, 231 F. Supp. 2d 1329, 1335 (N.D. Ga. 2002). So the court will consider Ms. Abraham's affidavit for summary judgment purposes.

## II.      Factual and Procedural Background

The claims at issue for summary judgment purposes fall in to two broad categories: (1) claims arising out of the intersection of the failed business and personal relationship of Mr. Koster and Ms. Grafova; and (2) claims arising from a series of loans Ms. Grafova made to Euroboor FZC that Euroboor FZC has not repaid. The court will set out the facts of each category separately.

### A.      Relationship Between Ms. Grafova, Mr. Koster, and the Euroboor Entities

The "Euroboor group" of companies spans the globe and specializes in manufacturing portable industrial tools. At least four separate entities comprise the Euroboor group of companies: Euroboor B.V., a company incorporated under the laws of the Netherlands; Euroboor

USA, a Delaware corporation with its principal place of business in Birmingham, Alabama; Euroboor FZC, an LLC organized under the laws of the United Arab Emirates; and MEEBS, another UAE entity. (Doc. 205-1 at 38, 72). Albert Koster owns Euroboor B.V. and 80% of Euroboor FZC; Ms. Grafova owns the other 20% of Euroboor FZC. Euroboor B.V. owns Euroboor USA. (Doc. 205-1 at 36). Mr. Koster acts as the CEO of all Euroboor entities. (Doc. 205-1 at 72). *See also* (doc. 205-1 at 149).

On June 1, 2014, Elena Grafova signed an employment contract to work as Euroboor B.V.'s "Marketing Sales Manager of the Eastern Europe Territories." (Doc. 205-2 at 178). Ms. Grafova married Mr. Koster on September 26, 2014 and then began working as the CFO of at least Euroboor USA and Euroboor B.V. (Doc. 205-2 at 22). Mr. Koster alleges that Ms. Grafova worked as CFO for all of the Euroboor entities. (Doc. 207-1 at 10).

In June 2015, Mr. Koster incorporated Euroboor USA in Delaware; Euroboor USA then began operations in Birmingham, Alabama. (Doc. 205-5 at 139). The parties disagree as to the sequence of events leading up to the creation of Euroboor USA. Ms. Grafova alleges that Mr. Koster had the initial desire to create and subsequently invest in Euroboor USA. (Doc. 205-2 at 26). According to Ms. Grafova, Mr. Koster promised her a greater role in Euroboor USA's operations and greater control over Euroboor USA in exchange for her own financial investment in Euroboor USA. (Doc. 205-2 at 124–25).

Not surprisingly, Mr. Koster alleges the exact opposite: that Ms. Grafova initially raised the idea of opening Euroboor USA and pushed Mr. Koster to invest in and expand Euroboor USA. (Doc. 207-2 at 74–75). Additionally, Mr. Koster produced a text message from Ms. Grafova's son to Mr. Koster suggesting that Ms. Grafova wanted to invest in and build Euroboor USA. (Doc. 207-4 at 52–53).

The parties also dispute whether Ms. Grafova had an employment contract with Euroboor USA. Ms. Grafova alleges that she had an employment contract with Euroboor BV *only*. (Doc. 205-2 at 44). The Euroboor Plaintiffs allege that Ms. Grafova entered into an "Employment Offer Letter" with Euroboor USA. (Doc. 205-2 at 49). But the only "offer letter" produced by Euroboor USA is not signed by Ms. Grafova; Ms. Grafova testified that although she did sign an offer letter from Euroboor USA, she "cannot be sure" that the offer letter she signed is the same as the unsigned offer letter produced by Euroboor USA. (Doc. 205-2 at 173).

In any event, Ms. Grafova obtained an L-1 visa[1] and moved to Birmingham, Alabama in September 2017 to manage Euroboor USA. (Doc. 207-15 at 53–54). And at that point—for reasons unknown—Ms. Grafova's personal relationship with Mr. Koster had apparently deteriorated past the point of no return. As a result, Mr. Koster's arrival in the United States in 2017 did not end well.

According to Mr. Koster, Ms. Grafova told him that she wanted a divorce the day after he arrived in the United States in October 2017. (Doc. 207-1 at 52–53). Ms. Grafova then allegedly "became uncommunicative, misused company credit cards and resources, filed a worker's health and safety report that was deemed meritless, and failed to attend work on a regular basis." (Doc. 207-1 at 54; doc. 207-2 at 17–18). Mr. Koster also alleges that in November 2017, Ms. Grafova wrote two checks to herself out of Euroboor USA's bank account shortly after she told a Euroboor USA employee that she "had the ability to drain" Euroboor FZC's bank account. (Doc. 2017-15 at 89, 112, 114).  And on November 29, 2017, the Euroboor Plaintiffs allege that Ms. Grafova intentionally locked all of Euroboor USA's employees out of Euroboor USA's QuickBooks account, causing Euroboor USA to lose most of the day of work. (Doc. 220-2 at 3).

---

[1] L-1 Visas allow foreign workers to relocate to a corporation's U.S. office. (Doc. 207-4 at 10, ¶ 68).

Euroboor USA terminated Ms. Grafova's employment on November 30, 2017. (Doc. 207-15 at 78). Euroboor BV terminated her shortly thereafter. (Doc. 207-15 at 78).

Ms. Grafova disputes the events as described by the Euroboor Plaintiffs. Ms. Grafova claims that she "worked hard and was a diligent employee" for Euroboor USA. (Doc. 205-8 at 42).  Ms. Grafova claims that she wrote checks to herself from Euroboor USA's bank account so that another Euroboor USA employee could access Euroboor USA's funds while Ms. Grafova was on vacation. (Doc. 205-2 at 113). A Euroboor USA employee additionally testified that Ms. Grafova wrote the checks to herself in an attempt to transfer money from one bank branch to another because she didn't understand that she could transact business at *any branch* of an American bank, not just the branch that houses the main account. (Doc. 205-8 at 50–51). As to the QuickBooks incident, Ms. Grafova claims that she merely "removed herself as an administrator" from the account after her termination and did not intend that her actions would lock out Euroboor USA's employees from QuickBooks. (Doc. 205-2 at 82).

In any event, neither party disputes that on December 4, 2017—shortly after her termination from Euroboor USA—Ms. Grafova sent an email to a variety of individuals associated with Euroboor USA. (Doc. 205-1 at 3–4). Ms. Grafova began the email by explaining that the recent "turbulence" experienced by the Euroboor companies resulted from her telling Mr. Koster that she did "not love him anymore and want[ed] to divorce him." (Doc. 205-1 at 101). The rest of Ms. Grafova's email consists of a lengthy diatribe directed primarily at Mr. Koster, with the Euroboor entities falling in the crossfire. And Ms. Grafova included statements in the email that the Euroboor Plaintiffs allege constitute defamation. For example, Ms. Grafova claimed that Mr. Koster's brain was "definitely damaged by 15 years usage [*sic*] of heavy drugs." (Doc. 205-1 at 101). Ms. Grafova then turned her attention to Mr. Koster's involvement

with the Euroboor companies. According to Ms. Grafova, "there is no way that the company will grow and becomes [*sic*] successful with a 'leader' like Mr. Koster." (Doc. 205-1 at 102). She claimed that "Euroboor is in a serious decline and is falling apart;" that Mr. Koster "will spend his time and energy to hurt me as much as possible but not to run the company;" and that as Euroboor's CFO, she saw its financial state and realized that "there is no way I can get my [loan] money back without making Mr. Koster broke" and without causing Euroboor employees to lose their jobs. (Doc. 205-1 at 102).

Ms. Grafova also posted the same email on the Facebook wall of Margriet Dolsma, who previously worked as Mr. Koster's secretary at Euroboor BV in the Netherlands. (Doc. 205-2 at 83). According to Ms. Grafova, she did not intend for anyone other than Ms. Dolsma to see the posting. She alleges that she had never used Facebook before and did not realize that Ms. Dolsma's Facebook "friends," including other Euroboor associates, could see the post. (Doc. 205-2 at 84).

The Euroboor Plaintiffs claim that the content in Ms. Grafova's email caused one of Euroboor's suppliers to significantly reduce its business with Euroboor. (Doc. 205-5 at 42). But Mr. Koster testified that this particular supplier did not actually receive the email from Ms. Grafova or even actually see the email; the supplier merely learned about its contents through the grapevine. *See* (doc. 205-5 at 47–48). In Mr. Koster's words, "[t]he gossip went around. Ms. Grafova sent a message in the world. So, maybe my people talk, but I don't know who. People talk." (Doc. 205-5 at 48).

In fact, Mr. Koster testified that only two recipients of Ms. Grafova's email were not Euroboor employees or family members of Mr. Koster: (1) a realtor in Birmingham and (2) Euroboor's "tax and legal advisor." (Doc. 207-1 at 5–6). As to the post on Ms. Dolsma's

Facebook wall, Mr. Koster testified that several Euroboor suppliers and customers were Facebook "friends" with Ms. Dolsma and accordingly could see Ms. Grafova's post on Ms. Dolsma's Facebook wall. (Doc. 205-1 at 27).

Mr. Koster obviously vigorously disputes the allegations Ms. Grafova made in her email. Mr. Koster claims that the company was *not* "in a serious decline and . . . falling apart" (doc. 205-1 at 17); and that the company would not fail with him at the helm (doc. 205-1 at 16). As to his drug use, Mr. Koster denies 15 years of heavy drug usage. He did, however, testify that he had used marijuana in his teenage years and had last used it between 20 and 30 years ago, and he used cocaine "at a party maybe five, six seven times in my life." (Doc. 205-1 at 6).

After Ms. Grafova sent the allegedly defamatory email, Euroboor BV terminated her employment on January 4, 2018. (Doc. 205-2 at 114). Ms. Grafova then sued Euroboor BV in the Netherlands and claimed that Euroboor BV violated their employment contract by terminating her. (Doc. 205-11 at 21). Importantly, Euroboor BV counterclaimed against Ms. Grafova in the Dutch case and alleged that Ms. Grafova breached the confidentiality clause in her employment agreement with Euroboor BV by sending the email and posting it on Facebook. (Doc. 205-11 at 28).

The Dutch court found that Ms. Grafova violated the confidentiality clause twice: once for sending the email and once for posting it on Ms. Dolsma's Facebook wall. (Doc. 205-11 at 36). The Dutch court ordered Ms. Grafova to pay Euroboor BV €2,000 for her violations of the confidentiality clause. It also found that Euroboor violated the employment contract and ordered Euroboor to pay Ms. Grafova certain wages it owed her. (Doc. 205-11 at 37–38).

10

### B.     The Loans from Ms. Grafova to Euroboor FZC

As alluded to above, these motions for summary judgment will also require the court to

interpret two loan agreements entered into by Euroboor FZC and Ms. Grafova.

Ms. Grafova made two loans to Euroboor FZC: (1) she loaned it $560,000 on September

26, 2015 (doc. 205-2 at 203); and (2) she loaned it $140,000 on December 7, 2015. (Doc. 205-2

at 200). Both loan agreements required Euroboor FZC to pay back the principal sum plus interest

on December 31, 2019. (Doc. 205-2 at 200, 203).

The parties forcefully dispute the meaning of the loan agreements' interest provision.

That provision—which is identical in both loan agreements—provides:

> **Article 2. Interest**
> 2.1.     Debtor shall be liable to pay creditor an interest rate of 6 (six) % per annum
>           over the principal sum and/or the remaining debt amount.
> 2.2.     The interest is payable quarterly, commencing on January 1, 2016.
> 2.3      If and to the extent that the interest has not been paid, the interest shall be
>           added to the principal sum and shall be interest-bearing.

(Doc. 205-2 at 200, 203).

Under Article 4 of the loan agreement, the debtor triggers an acceleration clause in the

loan agreement if, among other things, it "fails to fulfill or violates any article within this

agreement[.]" (Doc. 205-2 at 200, 203). Finally, Article 4 of the loan agreements also provides

for (1) a penalty of $5,000 upon every breach of the loan agreement; and (2) an increase of the

penalty *for each breach* by $500 per day "of continuance of the breach." (Doc. 205-2 at 201,

204).

The parties agree that Euroboor FZC did not make a quarterly interest payment to Ms.

Grafova on January 1, 2016, or on any other date. The parties also agree that Euroboor FZC has

not paid back the loans, even though the loans are "due and payable." (Doc. 205-1 at 8). Ms.

Grafova alleges that Euroboor breached the loan agreements by failing to pay her quarterly

interest on January 1, 2016 and quarterly thereafter, and that those breaches triggered the acceleration and penalty clauses. She testified that she asked Mr. Koster to pay her interest under the agreements "sometime in 2016," but that Mr. Koster did not pay her the interest and instead told her "there will be better time [*sic*]." (Doc. 205-2 at 63). Ms. Grafova also produced evidence showing that Euroboor FZC created reports showing that it owed her 6% quarterly interest on the loans. *See, e.g.*, (Doc. 208-31 at 288). Ms. Grafova claims that she continued to make demands for interest on the loans through 2017. *See, e.g.*, (doc. 205-2 at 63).

In any event, the parties do not dispute that Ms. Grafova demanded *full* payment on the loans on November 28, 2017. (Doc. 37-1 at 4, ¶ 19). Mr. Koster and Euroboor FZC claim that the November 28, 2017 demand from Ms. Grafova was her first demand of any kind under the loan agreements. (Doc. 207-100 at 2).

Not surprisingly, the Euroboor Plaintiffs interpret the loan agreements in a different manner than Ms. Grafova. According to Mr. Koster and Euroboor, the loan agreements provided them with two options: (1) pay Ms. Grafova quarterly interest at 6% per annum under Article 2.2; *or* (2) withhold quarterly *payments* of interest and instead add the amount of those payments to the principal where those interest payments would themselves accrue interest; that is, pay Ms. Grafova compound interest under Article 2.3. (Doc. 207-4 at 7, ¶ 46). Under the Euroboor entities' interpretation of the loan agreement, compliance with *either* of these mechanisms of payment would not constitute a breach of the loan agreements. They point out that under Ms. Grafova's interpretation of the loan agreements, Euroboor FZC would owe Ms. Grafova over $21,000,000 on her $700,000 in loans; penalties would make up roughly 97% of the amount owing. (Doc. 207-33 at 31).

Additionally, Mr. Koster and Euroboor FZC allege that Ms. Grafova had essentially complete control over the finances of Euroboor FZC; they argue that she "had the power and obligation to make any required payments under the Loans on Euroboor FZC's behalf." (Doc. 201-1 at 29) (citing, *inter alia*, doc. 207-4 at 6) (Mr. Koster's testimony that Ms. Grafova "had the ability to approve Euroboor spending and write-offs"). The Euroboor Plaintiffs also allege that Ms. Grafova *herself* calculated the loans consistent with Euroboor FZC's understanding of the loan agreement: i.e., by adding the quarterly interest to the principal and allowing the quarterly interest to accrue interest along with the principal. (Doc. 207-98 at 49–50).

Ms. Grafova disputes the amount of control she had over the finances of Euroboor FZC. She claims that she did not have the ability to pay herself quarterly interest on the loans because she "did whatever [she] was asked by Mr. Koster" and that Mr. Koster had the ultimate control over Euroboor FZC's finances. (Doc. 205-2 at 22). As to the calculation of the interest on the loans, Ms. Grafova testified that she calculated the loans without quarterly interest payments because she believed Mr. Koster would make those payments, not because she did not expect Euroboor FZC to make any payments at all. (Doc. 205-2 at 63).

The parties also agree that Euroboor FZC does not have the ability to repay the loans. (Doc. 205-5 at 79). The parties disagree as to why Euroboor FZC lacks those funds. According to Ms. Grafova, Mr. Koster drained all of Euroboor FZC's assets in late 2018 through 2019 to avoid paying her under the loans, which all parties admit came due no later than December 31, 2019. (Doc. 205-2 at 123). Mr. Koster claims that Euroboor FZC's current financial state resulted from the litigation with Ms. Grafova. Specifically, Mr. Koster's testified that "[i]f (i) [Ms.] Grafova would not have accelerated the repayment of the Loans plus penalties and (ii) [Ms.] Grafova would not have filed her counterclaim for breach of contract then…Euroboor FZC

would have been in the position to repay the Loans' principal plus compound interest." (Doc. 207-4 at 10). Euroboor has not paid anything on the loans.

### C.    Procedural History

Euroboor BV, Euroboor USA, and Mr. Koster filed this suit against Ms. Grafova in December 2017. (Doc. 1). Euroboor BV, Euroboor USA, and Mr. Koster have ten claims pending against Ms. Grafova in their Second Amended Complaint, the Euroboor Plaintiffs' current operative complaint. (Doc. 105). Count One alleges that Ms. Grafova violated the Federal Computer Fraud and Abuse Act and also supports this court's exercise of federal question subject-matter jurisdiction over this case. (Doc. 105 at 10). Count Two alleges that Ms. Grafova violated the Alabama Digital Crime Act. (Doc. 105 at 13). Count Three alleges that Ms. Grafova trespassed the Euroboor entities' chattels by, among other things, misusing company credit cards; attempting to make certain withdrawals from Euroboor USA's bank account; and locking Euroboor USA employees out of their QuickBooks accounts. (Doc. 105 at 14–15).

Count Four alleges that Ms. Grafova tortiously interfered with the business relations of the Euroboor entities and Mr. Koster by sending the allegedly defamatory email and posting it to Ms. Dolsma's Facebook wall. (Doc. 105 at 16). Count Five alleges that Ms. Grafova defamed the Euroboor Plaintiffs by sending the email and posting it to Facebook. (Doc. 105 at 17).

Count Six alleges that Ms. Grafova converted the personal property of the Euroboor Plaintiffs by writing checks for herself out of company funds and taking company data files. (Doc. 105 at 18).

Count Seven alleges that Ms. Grafova was negligent and/or wanton in sending the email and posting it to Facebook and by taking and keeping company information and property after her termination. (Doc. 105 at 19). Count Eight alleges that Ms. Grafova breached her fiduciary

duty and her duty of loyalty to the Euroboor entities by sending the email and posting it to Facebook and by failing to return company property. (Doc. 105 at 20).

Count Nine alleges that Ms. Grafova committed fraud: the Euroboor Plaintiffs claim that Ms. Grafova never intended to fulfill her duties as CFO of Euroboor USA and that they suffered damages in reliance on that misrepresentation by securing Ms. Grafova's L-1 Visa and by installing new management in Euroboor BV. (Doc. 105 at 21–22). Finally, Count Ten alleges that Ms. Grafova breached her employment agreement with Euroboor BV by sending and posting the allegedly defamatory email to Facebook, by failing to work forty hours per week, and by failing to return company property after her termination. (Doc. 105 at 23).

Ms. Grafova has moved for summary judgment on all the Euroboor Plaintiffs' claims except for the claim under the Federal Computer Fraud and Abuse Act (Count One) and the fraud claim (Count Nine). (Doc. 204 at 1).

In her answer, Ms. Grafova included counterclaims against Mr. Koster, Euroboor BV, and Euroboor USA and joined Euroboor FZC as a counterclaim defendant. (Doc. 9). She amended her counterclaim complaint in 2018 and asserted that Euroboor BV, Euroboor USA, and Mr. Koster fraudulently induced her to come to the United States (Counterclaim Count One) (doc. 56 at 15); that Mr. Koster and Euroboor BV converted her personal belongings during her move to the United States (Counterclaim Count Two) (doc. 56 at 17); that Euroboor BV, Mr. Koster, and Euroboor FZC fraudulently induced Ms. Grafova to loan them money (Counterclaim Count Three) (doc. 56 at 18); and that Euroboor FZC and Mr. Koster breached the loan agreements she made with Euroboor FZC (Counterclaim Count Four) (doc. 56 at 20). Ms. Grafova's counterclaim also alleged that Mr. Koster "operates his family of companies, Euroboor [BV], Euroboor USA, and Euroboor FZC, as his alter ego." (Doc. 56 at 2, ¶ 9).

The Euroboor Plaintiffs moved to dismiss all of Ms. Grafova's counterclaims in September 2018. (Docs. 68, 70). The court granted the motion only as to her counterclaim for conversion (Counterclaim Count Two) (doc. 88 at 19–22). The court dismissed Ms. Grafova's conversion counterclaim on international comity grounds because a court in the Netherlands had already adjudicated claims by Ms. Grafova regarding the same property at issue in her conversion counterclaim. (Doc. 88 at 21).

Also relevant here, the court declined to dismiss Ms. Grafova's counterclaim against Euroboor FZC for breach of the loan agreements. (Doc. 88 at 22–25). Euroboor FZC argued—as it does here—that it did not breach the loan agreements by failing to pay Ms. Grafova quarterly interest because, it argues, the loan agreement independently allowed it to pay Ms. Grafova compound interest at the end of the loan term in lieu of paying her quarterly interest. (Doc. 88 at 23). This court rejected that argument and denied the motion to dismiss. (Doc. 88 at 24).

Euroboor USA, Euroboor BV, and Mr. Koster have moved for summary judgment on Ms. Grafova's veil-piercing allegations and on Ms. Grafova's fraud claim (Counterclaim Count Three) (doc. 199-1 at 3). They also argue that Ms. Grafova "cannot maintain a breach of contract claim against [Mr.] Koster because [Mr.] Koster is not a party to the loan agreements." (Doc. 199-1 at 3).

Both Euroboor FZC and Ms. Grafova have moved for summary judgment on Ms. Grafova's claim against Euroboor FZC for breach of the loan agreements (Counterclaim Count Four) (doc. 204 at 2 (Ms. Grafova's motion)); (doc. 201-1 at 1 (Euroboor FZC's motion)). Ms. Grafova seeks a finding that Euroboor FZC breached the loan agreements by failing to pay her interest quarterly. (Doc. 204 at 2). Euroboor FZC seeks the opposite finding: that it did not breach the loans by failing to pay Ms. Grafova interest quarterly (doc. 201-1 at 1). Euroboor FZC

also asks this court to hold that it does not owe Ms. Grafova any penalties under the loan agreements or in the alternative that it owes her "no more than $8,015.20 in penalties." (Doc. 201-1 at 1).

The parties have completed the briefing on these motions, so the motions are ripe for the court's review. Because Euroboor BV, Euroboor USA, and Mr. Koster "do not intend to pursue a claim under the Alabama Digital Crime Act" (Count Two) (doc. 211 at 26) and "do not intend to pursue their claim for conversion" (Count Six) (doc. 211 at 29) against Ms. Grafova, the court will **GRANT** Ms. Grafova's motion for summary judgment as to the Euroboor Plaintiffs' Count Two (claim under the Alabama Digital Crime Act) and Count Six (conversion claim) and will **ENTER SUMMARY JUDGMENT** in favor of Ms. Grafova and against Mr. Koster, Euroboor BV, and Euroboor USA on those claims.

Additionally, Ms. Grafova admits that Mr. Koster is not a party to the loan agreements and is "not challenging" his request for summary judgment on her Counterclaim Count Four. (Doc. 214 at 1, 7 ¶ 74). Accordingly, the court will **GRANT** Mr. Koster's motion for summary judgment on Counterclaim Count Four and will **ENTER SUMMARY JUDGMENT** against Ms. Grafova and in favor of Mr. Koster on Counterclaim Count Four *to the extent that he was not a party to the loan agreements*. In other words, Mr. Koster may *still face personal liability* for Euroboor FZC's breach of the loans under a veil-piercing theory, which the court will discuss below.

The court will first analyze Ms. Grafova's and Euroboor FZC's cross-motions for summary judgment on Ms. Grafova's Counterclaim Count Four, breach of the loan agreements. The court will then analyze the Euroboor Plaintiffs' motion for summary judgment and their arguments that Ms. Grafova cannot pierce the veil of Euroboor FZC to reach Mr. Koster and that

Ms. Grafova's fraud claim fails. Finally, the court will address Ms. Grafova's motion for summary judgment as to the Euroboor Plaintiffs' claims against her.

## III.     Legal Standards

These motions for summary judgment will require the court to apply the law of the Netherlands and the United Arab Emirates. These motions will also require the court to determine whether to abstain from hearing certain of the Euroboor Plaintiffs' claims against Ms. Grafova on international comity grounds. Accordingly, the court will set out (1) the summary judgment standard applicable when a court must decide cross-motions for summary judgment; and (2) general choice-of-law principles regarding the determination and application of foreign law.

### A.     Summary Judgment Standard

Summary judgment allows a trial court to decide cases that present no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991). In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party to defeat the motion. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id*. at 255.

Furthermore, the court must view all evidence and inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both sides have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

Euroboor FZC and Ms. Grafova have filed cross-motions for summary judgment on Ms. Grafova's Counterclaim Count Four, her claim that Euroboor FZC breached the loan agreements. The filing of cross-motions for summary judgment does not affect the summary judgment standard. *See, e.g.*, *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984). And the Eleventh Circuit has clarified that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Oakley*, 744 F.2d at 1555. Instead, "[t]he [c]ourt must consider each motion on its own merits, resolving all

reasonable inferences against the party whose motion is under consideration." *Ala. Mun. Ins. Co. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (11th Cir. 2017) (quoting *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014)).

And finally, "[t]he fact that both parties simultaneously are arguing that there is no genuine issue of fact…does not establish that a trial is unnecessary thereby empowering the court to enter judgment at it sees fit." *Citizens Bank & Tr. v. LPS Nat'l Flood, LLC*, 51 F. Supp. 3d 1157, 1168–69 (N.D. Ala. 2014) (quoting *Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1289 (N.D. Ala. 2009)). In other words, the court cannot merely rely on the parties' assertions that no factual disputes exist but must decide for *itself* whether genuine issues of material fact exist.

### B.      Choice of Law Standards

Federal courts exercising supplemental jurisdiction over state-law claims in federal-question cases apply the choice of law rules of the state in which the federal court sits—in this case, Alabama. *See Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *Benchmark Med. Holdings v. Rehab Sols., LLC*, 307 F. Supp. 2d 1249, 1258–59 (M.D. Ala. 2004).

As for foreign law, the burden of producing any applicable foreign law falls on the parties. In other words, the "district court is not required to conduct its own research into the content of foreign law if the party urging its application declines to do so." *Mut. Serv. Ins. Co. v. Frit Indus.*, 358 F.3d 1312, 1321 (11th Cir. 2004) (citing *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 n.10 (9th Cir. 1989)). And finally, when a party does not raise a choice of law

20

issue, the court may assume that the parties have acquiesced in the application of the law of the forum. *Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 882 (11th Cir. 1983).

But in making its determination of foreign law, the court "may engage in its own research and consider any relevant material thus found." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869–70 (2018) (citing Advisory Committee's 1966 Note on Fed. R. Civ. P. 44.1)). And if "no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice." *Frit Indus.*, 358 F.3d at 1321 (citing Restatement (Second) of Conflict of Laws, § 136, cmt. h, at 378–79 (1971)).

The loan agreements between Ms. Grafova and Euroboor FZC contain a choice-of-law clause providing that "the laws of The Netherlands" will "exclusively govern[]" the agreements. (Doc. 205-2 at 201, 204). Alabama courts enforce choice-of-law clauses in valid contracts, "so long as they are not unfair or unreasonable under the circumstances." *Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So. 2d 1129, 1132 (Ala. 2003) (citing *Prof'l Ins. Corp. v. Sutherland*, 700 So. 2d 347, 351 (Ala. 1997)). And the parties do not dispute that Dutch law governs the loan agreements. Accordingly, the court will apply Dutch law to its interpretation of the loan agreements.

Alabama courts also adhere to the so-called "internal affairs doctrine," under which "the law of the state of incorporation governs the internal corporate relationship." *Scrushy v. Tucker*, 70 So. 3d 289, 298 (Ala. 2011) (quoting *Ex parte Bentley*, 50 So. 3d 1063, 1070 (Ala. 2010)). And "[u]nder this doctrine, courts look to a corporation's state of incorporation as the source of substantive law governing claims regarding that corporation's internal affairs." *Scrushy*, 70 So.

3d at 298 (quoting *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1214 (N.D. Cal.

2007)) (emphasis omitted).

Additionally, although no Alabama court has addressed the issue, federal courts

interpreting Alabama choice-of-law rules have determined that Alabama courts would likely

follow the internal affairs doctrine and apply the law of a corporation's place of incorporation in

conducting a veil-piercing analysis. *See, e.g.*, *Jefferson Pilot Broad. Co. v. Hilary & Hogan Inc.*,

617 F.2d 133, 135 (5th Cir. 1980)[2] ("we think that Alabama courts would look to the law of the

incorporating state…in deciding whether to recognize or disregard a corporate entity") (citing

Restatement of Conflict of Laws § 154, cmt. a (1934)); *Grp. CG Builders & Contractors v.*

*Cahaba Disaster Recovery, LLC*, No. CA 11-00729-KD-C, 2012 WL 3245972, at *11 (S.D. Ala.

2012) ("[t]he law to be applied to plaintiff's piercing the corporate veil/alter ego theory [] instead

*likely* turns on the law of incorporation of the entity…to be pierced") (emphasis in original);

*Charter Servs. v. DL Air, LLC*, 711 F. Supp. 2d 1298, 1306 n.13 (S.D. Ala. 2010); *Horton*

*Homes, Inc. v. Bandy*, No. 2:07-cv-506-MEF, 2007 WL 4571251, at *2 (M.D. Ala. 2007) ("veil-

piercing issues concerning disregard of corporate form are to be determined by reference to the

law of the state under which the corporation exists").

For purposes of the internal affairs doctrine, courts look to the corporation's place of

incorporation as the source of law applicable to claims regarding the corporation's internal

affairs regardless of whether the corporation's place of incorporation is a sister state or a foreign

country. *See, e.g.*, *Exter Shipping Ltd. v. Kilakos*, 310 F. Supp. 2d 1301, 1316 (N.D. Ga. 2004).

Ms. Grafova seeks to pierce the corporate veil of Euroboor FZC in this case. Because

Euroboor FZC is incorporated in the United Arab Emirates, the court will apply the law of the

---

[2] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

UAE to determine whether Mr. Koster is entitled to summary judgment on Ms. Grafova's veil-piercing claim against Euroboor FZC.

Finally, as to the Euroboor Plaintiffs' claims against Ms. Grafova, no party has produced any foreign law applicable to those claims or has otherwise stated an intention to rely on foreign law for purposes of those claims. So the court will apply Alabama substantive law to the Euroboor Plaintiffs' claims against Ms. Grafova, which for summary judgment purposes all arise under state law. *See Mut. Serv. Ins. Co. v. Frit Indus.*, 358 F.3d 1312, 1321 (11th Cir. 2004).

## IV.    Analysis

The court will first address Ms. Grafova and Euroboor FZC's cross-motions for summary judgment on Ms. Grafova's Counterclaim Count Four, Ms. Grafova's claim that Euroboor FZC breached the loan agreements. The court will then address the Euroboor Plaintiffs' motion requesting summary judgment on Ms. Grafova's veil-piercing allegations and on her fraud claim (Counterclaim Count Three). Finally, the court will address Ms. Grafova's motion for summary judgment on certain of the Euroboor Plaintiffs' claims.

### A.    Counterclaim Count Four: Breach of the Loans

Ms. Grafova asks the court to make two rulings on her Counterclaim Count Four: (1) that Euroboor FZC owes her the principal and compounded quarterly interest that became due on December 31, 2019 that Euroboor FZC has yet to repay; and (2) that Euroboor FZC breached the loan agreements by failing to pay her quarterly interest starting on January 1, 2016 and each subsequent quarter. (Doc. 204 at 2). Euroboor FZC asks the court to rule (1) that its failure to pay Ms. Grafova interest quarterly did not constitute a breach of the loan agreements; and (2) that the maximum penalty amounts under the loans agreements' penalty clauses are excessive, unfair,

23

and unreasonable and the court should mitigate them as allowed by Dutch law; or in the alternative, that Ms. Grafova is entitled to no more than $8,015 in penalties. (Doc. 201-1 at 1).

### i.      The Undisputed Amount Due Under the Loan

Before addressing the parties' disagreements as to the loan agreements, the court will first make clear that Euroboor FZC owes Ms. Garcia at minimum the principal of the loans and the compounded quarterly interest. The parties do not dispute that Euroboor FZC breached the loan agreements on December 31, 2019 by failing to pay Ms. Grafova the principal and compounded quarterly interest. (Doc. 211 at 21). Thus, Euroboor FZC admits that it owed Ms. Grafova at least the following in principal and compound quarterly interest as of March 31, 2021: (i) $765,521.27 for the loan of $560,000 plus interest; and (ii) $191,380.32 for the loan of $140,000 plus interest. (Doc. 207-32 at 9–10).

Although the numbers that the parties provided are outdated,[3] the court will **GRANT** Ms. Grafova's motion on Counterclaim Count Four to the extent that Euroboor FZC owes Ms. Grafova *at least* what it agrees it owes: the principal and compounded quarterly interest. (Doc. 201-1 at 1). This amount totaled $956,901.59 as of March 31, 2021, but the principal will continue to accrue compounded quarterly interest at the contractual rate of 6% per annum until the court determines how much Euroboor FZC owes Ms. Grafova in penalties. Once the court determines the penalties owed to Ms. Grafova, the court will enter final judgment on the *total* amount Euroboor FZC owes Ms. Grafova under the loan agreements—including principal, interest, and penalties.

---

[3] The court estimates that, as of September 23, 2021 (the date of this opinion's publishing), the amount due has grown to $788,691.21 for the loan of $560,000 plus interest, and $197,172.80 for the loan of $140,000 plus interest. This produces a total of $985,864.01.

The court will next address the differing interpretations of the loan agreements advanced by the parties and the effect those interpretations have on the amount of *penalties* Euroboor FZC owes Ms. Grafova; the court will finally address whether the penalty amount should be mitigated under Dutch law.

### ii.      Ms. Grafova's Interpretation of Article 2 of the Loan Agreements

Under Ms. Grafova's interpretation of Article 2 of the loan agreements, Euroboor FZC breached the loan agreements *each quarter* that it failed to pay her interest, with the first breach occurring on January 1, 2016. (Doc. 204 at 17). The answer to the question of when Euroboor FZC first breached the loan agreements has repercussions as to the penalty clauses of the loans, which provide for a $5,000 penalty for *each breach* of the loans and an additional penalty of $500 *per day* that *each breach* goes unremedied. (Doc. 205-2 at 201, 204).

Under Ms. Grafova's interpretation of Article 2 of the loan agreements, Euroboor FZC would owe her approximately $20 million in penalties. (Doc. 207-32 at 9–10). When this loan amount is combined with the principal and interest that the parties agree Euroboor FZC owes Ms. Grafova, Euroboor FZC would owe approximately $21 million, with penalties constituting roughly 95% of that amount.[4]

### iii.      Euroboor FZC's Interpretation of Article 2 of the Loan Agreements

Under Euroboor FZC's interpretation of Article 2 of the loan agreements, it only breached the loan agreements *once*: it breached them on December 31, 2019 when it failed to pay Ms. Grafova the principal and compounded quarterly interest it agrees it owes her. (Doc. 201-1 at 32–34).

---

[4] As of March 2021, Euroboor FZC owed Ms. Grafova roughly $956,000 in interest and principal. Under Ms. Grafova's interpretation of Article 2, it would owe Ms. Grafova roughly $20,000,000 in penalties, for a total amount owing of roughly $21,000,000. So, 21 million divided by 20 million equals 95.2%.

Under Euroboor FZC's interpretation of the loans, it would owe Ms. Grafova $466,000 in penalties as of March 31, 2021, based on a one-time breach for Euroboor FZC's failure to pay the loan principal and interest on December 31, 2019 (when the loans became due), along with $500 daily penalties. (Doc. 201-1 at 32–33). When this loan amount is combined with the principal and interest the parties agree Euroboor FZC owes Ms. Grafova, Euroboor FZC would owe approximately $1.4 million, with penalties constituting roughly 33% of that amount.[5] (Doc. 207-32 at 15–16).

### iv.  Mitigation of Penalties under Dutch Law

Euroboor FZC asks the court to mitigate the amount it owes Ms. Grafova in penalties under Dutch law, which allows courts to mitigate excessive contractual penalty amounts. As explained above, the parties' differing interpretations of Article 2 do not affect the amount of *principal and interest* Euroboor FZC owes Ms. Grafova; the parties agree that Euroboor FZC owes Ms. Grafova the principal and compounded quarterly interest totaling $956,901.59 as of March 31, 2021. Instead, the parties' differing interpretations of Article 2 affect only the *penalty amount* Euroboor FZC owes Ms. Grafova.

The court agrees with Euroboor FZC that the penalty amounts resulting from *either* interpretation of Article 2 are excessive, so the court does not need to resolve the parties' differing interpretations as to Article 2 of the loan agreements. In other words, the court finds the penalty amounts excessive *regardless* of whether Euroboor FZC breached the loans at any time prior to December 31, 2019, when it failed to pay Ms. Grafova her principal and compounded quarterly interest. So, under either interpretation of Article 2 of the loan agreements, the end

---

[5] As of December 31, 2020, Euroboor FZC owed Ms. Grafova roughly $956,000 in interest and principal. Under Euroboor FZC's interpretation of Article 2, it would owe Ms. Grafova roughly $466,000 in penalties, for a total amount owing of roughly $1.4 million. So, 466,000 divided by 1,400,000 equals 33.2%.

result will be the same: Euroboor FZC will owe Ms. Grafova principal and compound quarterly interest in addition to a penalty amount that the court will determine on a later date. The court reserves ruling on the amount Euroboor FZC owes Ms. Grafova in penalties. And the loans will continue to accrue the contractual 6% annual interest until Euroboor pays what it owes or the court determines how much Euroboor FZC owes Ms. Grafova in penalties.

As Euroboor FZC points out, the concepts of "reasonableness and fairness" play a large role in Dutch law. Under Article 6:248(1) the Dutch Civil Code,[6] for instance, "[a]n agreement not only has the legal effects which parties have agreed upon, but also those which, to the nature of the agreement, arise from law, usage (common practice) or the *standards of reasonableness and fairness*." (Emphasis added). In a similar vein, Article 6:2(2) provides that "[a] rule in force between a creditor and his debtor by virtue of law, common practice or a juridical act does not apply as far as this would be unacceptable, in the circumstances, *by standards of reasonableness and fairness*." (Emphasis added).

As to contractual penalty clauses specifically, Article 6:94(1) of the Dutch Civil Code provides that "[t]he *court* may, upon the request of the debtor, reduce the contractual penalty if this is obviously required by the *standards of reasonableness and fairness*, on the understanding that it cannot grant the creditor less than the applying compensation for damages that would have been due by virtue of law (statutory provisions)." (Emphasis added).

The Dutch Supreme Court has pointed out the "incentive function" of penalty clauses and emphasized that Dutch law allows for the mitigation of penalties that lead to "an *excessive* and therefore unacceptable result." *Turan B.V., f/k/a Protec Uitzendbureau B.V. v. Easystaff Payroll Servs., B.V.*, 2018:207, Case No. 17/00024 (2018)[7] (emphasis added). Dutch courts consider four

---

[6] Available at www.dutchcivillaw.com.
[7] Translated copy located at doc. 207-105 in the ECF docket of this case.

factors in determining whether and to what extent to mitigate penalties: (1) "the amount of the actual loss/damage suffered relative to the amount of the penalty;" (2) "the nature of the agreement;" (3) "the contents and purport of the clause;" and (4) "the circumstances under which [the penalty clause] was invoked." *Easystaff*, Case No. 17/00024 at ¶ 3.4.1; (doc. 207-105 at 5) (emphasis added). Although *Easystaff* concerned an employment contract rather than a loan, the penalty structure of the employment contract was quite familiar; its non-compete provision imposed a penalty of €20,000 for each breach and a €5,000 penalty for "each day that the breach continues." *Id.* at ¶ 3.1. The *Easystaff* plaintiff sought the amount owed under the strictest reading of the penalty provision—€1.23 million. *Id.* at ¶ 3.2.1. But the Dutch Supreme Court affirmed a mitigation of the penalty to €21,125—a roughly 98% reduction. *Id.* at ¶3.5.2.

The court determines that the $20 million penalty amount Euroboor FZC would owe Ms. Grafova under Ms. Grafova's interpretation of the loan agreements is unconscionable. The court need look no further than the first *Easystaff* factor: the $20 million penalty amount is so disproportionate to the loss suffered by Ms. Grafova (roughly $1 million as of March 2021) that the penalty is unfair and unreasonable. *See Easystaff*, Case No. 17/00024 at ¶ 3.4.1; (doc. 207-105 at 5).

Additionally, the court determines that the $466,000 penalty amount resulting from Euroboor FZC's interpretation of the loan agreements is also unreasonable considering the amount of loss suffered by Ms. Grafova. Such a penalty amount would essentially allow Ms. Grafova a recovery-and-a-half. *See Easystaff*, Case No. 17/00024 at ¶ 3.4.1; (doc. 207-105 at 5).

Because the court finds unfair and unreasonable under Dutch law the $466,000 penalty amount resulting from an assumption that Euroboor FZC only breached the loan agreements once on December 31, 2019 by failing to repay Ms. Grafova's principal and compound quarterly

28

interest, the court need not engage in the interpretation analysis to determine whether Euroboor FZC breached the contract at any time before December 31, 2019. In other words, the only effect such a determination would have on this case would be to raise the penalty amount above $466,000; because the court concludes that $466,000 is *itself* an unfair and unreasonable penalty amount under Dutch law, the court need not decide the interpretation question.

However, Dutch law also urges courts to recognize the "incentive function" of penalty clauses. *Easystaff*, Case No. 17/00024 at ¶ 3.4.1; (doc. 207-105 at 5). In light of that directive, the court finds that the $8,015 penalty amount urged by Euroboor FZC represents *too low* of an amount to properly serve the incentive function of the penalty clauses. The number urged by Euroboor FZC lands on the other end of the spectrum from Ms. Grafova's requested amount: the $8,015 figure would represent just over *one percent* of the $700,000 loan principal. For a point of reference, the current annual mortgage interest rate in the United States has recently hovered around 2.5%. *See, e.g.*, *Current mortgage and refinance rates*, NerdWallet (last accessed Aug. 9, 2021), https://www.nerdwallet.com/mortgages/mortgage-rates.

Accordingly, the court will need to determine a penalty amount that falls somewhere between the $8,015 figure urged by Euroboor FZC and the $466,00 it would owe under its interpretation of the loans. So the court will defer ruling as to the *amount* of penalties that Euroboor FZC owes Ms. Grafova under the *Easystaff* factors and will hold a bench hearing as to that amount on a later date.

Because the court will mitigate the penalty amount to a figure *below* the amount Euroboor FZC would owe Ms. Grafova as a penalty even if the court accepted Euroboor FZC's interpretation of the loans, the court need not rule on the interpretation issue. The court will **GRANT** Ms. Grafova's motion for summary judgment on her Counterclaim Count Four to the

extent that Euroboor FZC owes Ms. Grafova principal and compounded quarterly interest on the loans ($956,901.59 as of March 31, 2021).[8] It will **DENY** her motion to the extent that she requests a ruling that Euroboor FZC breached the loans by failing to pay her interest quarterly and seeks penalties totaling $20 million.

The court will **GRANT** Euroboor FZC's motion to the extent that it requests a ruling that the maximum penalty amounts resulting from either interpretation of the loans constitute an unfair amount under Dutch law. The court will **DENY** Euroboor FZC's motion to the extent that it requests a ruling that it owes Ms. Grafova no more than $8,015 in penalties.

### B.    Ms. Grafova's Veil-Piercing Allegation

Mr. Koster, Euroboor BV, and Euroboor USA request summary judgment on Ms. Grafova's allegations that this court should pierce the corporate veils of the Euroboor entities to hold Mr. Koster personally liable for Ms. Grafova's counterclaims against the Euroboor entities.

The court refers to the veil-piercing "allegations" as such because Ms. Grafova did not technically bring a "claim" to pierce the veils of the Euroboor entities. *See* (doc. 56). Although the parties did not raise the issue, the court finds that Ms. Grafova properly put Mr. Koster on notice of her intent to attempt to pierce the veils of the Euroboor entities. *See, e.g.*, *Northstar Marine, Inc. v. Huffman*, No. 13-0037-WS-C, 2014 WL 4854843, at *9 (S.D. Ala. Sept. 29, 2014) (finding that plaintiff intending to pierce the corporate veil must plead such intent "in a manner that, at a minimum satisfies the notice pleading requirements of Rule 8(a), Fed. R. Civ. P."). Ms. Grafova's Second Amended Counterclaim Complaint seeks to hold Mr. Koster personally liable for any judgment recovered against the Euroboor entities, and Paragraph 82 of

---

[8] As stated in note 3, *supra*, the court estimates that, as of September 23, 2021, the amount due has grown to $788,691.21 for the loan of $560,000 plus interest, and $197,172.80 for the loan of $140,000 plus interest. This produces a total of $985,864.01.

that complaint alleged that "Mr. Koster treats Euroboor, Euroboor USA, and Euroboor FZC as his alter ego." (Doc. 56 at 14, ¶ 82). These allegations are enough to put Plaintiffs on notice of Ms. Grafova's intent to pierce the corporate veil.

So the court now turns to Euroboor's motion for summary judgment on the veil-piercing allegations. The parties first dispute whether the court may properly consider a veil-piercing theory of liability at the summary judgment stage. But Ms. Grafova has not provided any law— nor has the court located any—directing courts to withhold granting summary judgment on a veil-piercing theory of liability. On the contrary, federal courts may properly grant summary judgment on a veil-piercing theory where, as usual, the party seeking to pierce a corporate veil has not presented a genuine issue of material fact as to the veil-piercing theory. *See, e.g.*, *Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 845 (11th Cir. 1989) ("Because appellant did not raise any genuine issue as to whether appellee had used [the corporation] for an improper purpose, the court's decision to grant summary judgment in favor of appellee was correct") (emphasis added).

### i.      Euroboor BV and Euroboor USA

The Euroboor Plaintiffs next argue that Ms. Grafova has abandoned any veil-piercing claims against Euroboor USA and Euroboor BV because she did not address those entities in response to the Euroboor Plaintiffs' motion for summary judgment. The court agrees. A party "that fails to defend a claim that is targeted by a summary judgment motion is deemed to have abandoned that claim." *Adams v. Bank of Am, N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017) (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) and collecting cases).

Ms. Grafova's response to the Euroboor Plaintiffs' motion for summary judgment does not contain any argument that Mr. Koster should face personal liability for any judgment Ms. Grafova obtains against Euroboor BV or Euroboor USA. Accordingly, the court concludes that Ms. Grafova has abandoned any veil-piercing claims against Euroboor BV and Euroboor USA and will **GRANT** the Euroboor Plaintiffs' motion as to Euroboor BV and Euroboor USA.

But Ms. Grafova has expressed concern that Mr. Koster may take advantage of this court's ruling in his favor on Ms. Grafova's veil-piercing claims by draining assets from the Euroboor entities or otherwise attempting to hide the entities' assets. To this point, the court reminds Mr. Koster, as it did in November 2019, that "any attempts to fraudulently conceal or dissipate assets may incur sanctions from the court." (Doc. 118). If Mr. Koster does take such action, Ms. Grafova may pursue post-judgment relief. *See, e.g.*, Fed. R. Civ. P. 60(b)(3).

### ii.    Euroboor FZC

As to Euroboor FZC, the court concludes that genuine issues of material fact exist as to whether this court should pierce its veil to reach Mr. Koster personally.

As explained above, Alabama courts would likely apply the law of the corporation's place of incorporation to the veil-piercing analysis. *See, e.g.*, *Jefferson Pilot Broad. Co. v. Hilary & Hogan Inc.*, 617 F.2d 133, 135 (5th Cir. 1980) ("we think that Alabama courts would look to the law of the incorporating state…in deciding whether to recognize or disregard a corporate entity") (citing Restatement of Conflict of Laws § 154, cmt. a (1934)). Because Euroboor FZC is a limited liability company organized under the laws of the United Arab Emirates, the court will apply UAE law to the veil-piercing analysis. (Doc. 208-2 at 37–38).

Mr. Koster owns 80% percent of Euroboor FZC (doc. 205-1 at 36) and also acts as one of its directors. (Doc. 208-2 at 39). Under the law of the UAE, an *owner* of an LLC may face

32

personal liability for the actions of the LLC if he, among other things, uses the LLC to "drive a personal agenda." Danielle O'Brien, *Piercing the Corporate Veil*, Horizons & Co. (May 4, 2020), https://www.horizlaw.ae/news/piercing-corporate-veil. And an owner of an LLC in the UAE "drives a personal agenda" where (1) "[t]he acts of the shareholder/LLC resulted in harm to third parties; and (2) [t]he acts were deceitful or culminate in what could be characterized as a gross mistake." O'Brien, *supra* (citing Dubai Court of Cassation Case No. 69, 70/2007).

Additionally, *managers and directors* of LLCs in the UAE may face personal liability for the debts of the LLCs where "(i) they fail to act within the statutory duty of care, (ii) they act fraudulently, or (iii) they abuse the protection afforded by the principle of legal separation between an LLC and its shareholders and managers." O'Brien, *supra*.

The court concludes that Ms. Grafova has presented evidence that creates a genuine issue of material fact that Mr. Koster abused Euroboor FZC's LLC form to avoid repaying her under the loan agreements. The parties agree that Euroboor FZC did not have the assets to repay Ms. Grafova on the loans on the due date of December 31, 2019. (Doc. 205-5 at 79). And Ms. Grafova has presented evidence that in late 2018 through mid-2019—mere months before Ms. Grafova's loans to Euroboor FZC came due—Mr. Koster emptied the assets of Euroboor FZC (doc. 208-4 at 47); wrote off debts that Euroboor USA owed to Euroboor FZC (doc. 205-12 at 50); and downgraded Euroboor FZC to mere office space after transferring all of Euroboor FZC's equipment to a *new* UAE LLC named MEEBS. (Doc. 205-12 at 19–21).

Mr. Koster, however, claims that Euroboor FZC's current financial state resulted from the litigation with Ms. Grafova. Mr. Koster, for example, testified that "[i]f (i) [Ms.] Grafova would not have accelerated the repayment of the Loans plus penalties and (ii) [Ms.] Grafova

would not have filed her counterclaim for breach of contract then…Euroboor FZC would have been in the position to repay the Loans' principal plus compound interest." (Doc. 207-4 at 10).

The court has doubts that Ms. Grafova's request for payment and filing of a breach of contract claim directly affected Euroboor FZC's bottom line. But such a factual dispute is for the jury to decide. A jury *could* reasonably infer that Mr. Koster emptied Euroboor FZC to avoid repaying Ms. Grafova on the loans, especially given the close temporal proximity between the due date on the loans and the transfers Mr. Koster orchestrated from Euroboor FZC.

Mr. Koster's argument to the contrary fails. He points out that all of this conduct occurred "after the Loans were executed, after [Ms. Grafova] filed her Counterclaim, and even after [she] Amended [her] Counterclaim." (Doc. 227 at 7) (emphasis removed). Mr. Koster cites *Alabama law* for the proposition that courts must look to the time the parties entered into the loan agreements or when the first breach occurred for veil-piercing purposes. (Doc. 227 at 8) (citing *Cahaba Disaster Recovery, LLC v. DRC Emergency Servs., LLC*, No. 2:15-cv-02096-LSC, 2015 WL 9489911, at *5 (N.D. Ala. Dec. 30, 2015)).

But *UAE law* governs the veil-piercing analysis. And Mr. Koster has not shown that this timeline of events in any way forecloses Mr. Koster's personal liability on the loans on a veil-piercing theory of liability under UAE law. To the contrary, the timeliness argument works against Mr. Koster. The court has found at least one case in which a UAE court pierced the corporate veil to reach an LLC's shareholders where the LLC's shareholders drained the LLC to avoid paying the plaintiff a money judgment, a scenario similar to the facts at hand. Al Misbah Sabiel & Marwa El Mahdy, *Dubai: Liability of Shareholders in a Limited Liability Company*, Al Tamimi & Co. (December 2012–January 2013), https://www.tamimi.com/law-update-articles/dubai-liability-of-shareholders-in-a-limited-liability-company/.

34

Indeed, Mr. Koster's argument also fails under *Alabama law*. Under Alabama law, a shareholder in an LLC may face personal liability for an LLC's debts where the shareholder "drains funds from the corporation." *Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 401 (Ala. 1989). And Ms. Grafova has presented evidence that Mr. Koster drained the assets of Euroboor FZC *before the loans came due*, an acceptable time period for courts to consider when piercing the veil under Alabama law. *See, e.g.*, *Haas v. Howard Lumber Sales, Inc.*, CV-08-BE-2361-E, 2009 WL 10687782, at *2–3 (N.D. Ala. July 16, 2009) (finding that plaintiff stated a claim under a veil-piercing theory where the plaintiff alleged, among other things, that a corporation "drained the corporation's funds in order to limit the money that [Plaintiff] and other creditors might have available to them in the event of recovering a money judgment"); *Cahaba Disaster Recovery, LLC v. DRC Emergency Servs., LLC*, No. 2:15-cv-02096-LSC, 2015 WL 9489911, at *5 (N.D. Ala. Dec. 30, 2015).

Because a dispute of fact exists as to whether Mr. Koster deceitfully abused the principle of separation between himself and Euroboor FZC, the court will **DENY** the Euroboor Plaintiffs' motion for summary judgment on Ms. Grafova's claim to pierce the veil of Euroboor FZC.

### C.   Counterclaim Count Three: Ms. Grafova's Fraud Claim

In her Counterclaim Count Three, Ms. Grafova alleges that Mr. Koster, Euroboor BV, and Euroboor FZC fraudulently induced her to loan money to Euroboor FZC. Mr. Koster and Euroboor BV have moved for summary judgment on this claim. They argue that Ms. Grafova's fraud claim "is nothing more than a breach of contract claim masquerading as a fraud claim" and that the court should grant them summary judgment on that claim. (Doc. 199-1 at 3). The court disagrees and will **DENY** Mr. Koster and Euroboor BV's motion as to Counterclaim Count Three.

Because the parties did not raise the issue of foreign law as to Ms. Grafova's fraud claim and did not produce any foreign law applicable to that claim, the court will apply Alabama law to Ms. Grafova's fraud claim. *See Mut. Serv. Ins. Co. v. Frit Indus.*, 358 F.3d 1312, 1321 (11th Cir. 2004) ("[The] district court is not required to conduct its own research into the content of foreign law if the party urging its application declines to do so.").

The Euroboor Plaintiffs argue that because Mr. Koster promised to do something *in the future*—i.e., pay back Ms. Grafova's loans—Ms. Grafova's fraud claim constitutes a claim for promissory fraud. (Doc. 199-1 at 43) (citing *Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1211 (Ala. 2008)). And the Euroboor Plaintiffs argue that because Ms. Grafova has not produced evidence of any misrepresentations Mr. Koster made to her in connection with the loans, Ms. Grafova's promissory fraud claim really constitutes only a breach of contract claim. (Doc. 199-1 at 43–44) (citing *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998)) ("The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud.").

Assuming without deciding that Ms. Grafova's fraud claim against the Euroboor Plaintiffs does constitute a claim for promissory fraud, she must make out a prima facie case of promissory fraud by showing "(1) a misrepresentation[;] (2) of a material existing fact[;] (3) on which [she] relied[;] (4) which proximately caused injury or damage to [her;]" that (5) "at the time of the alleged misrepresentation (that is, the promise), [Mr. Koster] intended not to do the act or acts promised, but (6) intended to deceive [her]." *Washington*, 719 So. 2d at 776 (citing *Johnston v. Green Mountain, Inc.*, 623 So. 2d 1116, 1121 (Ala. 1993)).

Ms. Grafova has presented evidence supporting a prima facie case: specifically, she has presented evidence supporting an inference that she made the loans to Euroboor FZC in reliance

on Mr. Koster's representations that, in exchange for the loans, he would provide her with business influence over Euroboor USA, (doc. 205-2 at 123–24), but that Mr. Koster only intended to give Ms. Grafova business influence over Euroboor USA *if* she *remained his wife*. In support of this argument, Ms. Grafova points out that, among other things, Euroboor USA terminated her employment mere weeks after she informed Mr. Koster of her desire for a divorce (Doc. 207-15 at 78); and that Mr. Koster began complaining about Ms. Grafova's performance in her role at Euroboor USA shortly after she expressed to him her desire for a divorce. (Doc. 205-5 at 16–17).

In response to Ms. Grafova's argument, the Euroboor Plaintiffs *admit* that this evidence could create a genuine issue of material fact but point out that Ms. Grafova has contradicted herself as to her desire to exercise business influence over Euroboor USA. (Doc. 227 at 10). The Euroboor Plaintiffs point out, for example, that Ms. Grafova testified that she made the loans to Mr. Koster because he needed money (doc. 208-19 at 28) and that Euroboor USA was Mr. Koster's idea. (Doc. 208-19 at 28).

The court recognizes that inconsistencies may exist in Ms. Grafova's testimony as to why she made the loans to Euroboor FZC and as to her expected role with Euroboor USA. But the resolution of such inconsistencies falls to the *jury*, not to the court. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [she] is ruling on a motion for summary judgment or for a directed verdict.").

Accordingly, the Euroboor Plaintiffs have not shown the absence of a genuine issue of material fact as to Ms. Grafova's fraud claim. So the court will **DENY** the Euroboor Plaintiffs' motion for summary judgment as to Counterclaim Count Three.

### D.     Remaining Claims

Finally, Ms. Grafova has moved for summary judgment on the Euroboor Plaintiffs'

claims against her for trespass to chattel (Count Three); tortious interference with business

relations (Count Four); defamation (Count Five); negligence and wantonness (Count Seven);

breach of fiduciary duty (Count Eight); and breach of contract (Count Ten). The court will

consider these claims in turn.

Again, because the parties did not raise the issue of foreign law as to any of the remaining

claims and did not produce any foreign law applicable to those claims, the court will apply

Alabama law to the remaining claims. *See Mut. Serv. Ins. Co. v. Frit Indus.*, 358 F.3d 1312, 1321

(11th Cir. 2004).

### i.     Trespass to Chattel

To survive summary judgment on a claim of trespass to chattel under Alabama law, a

plaintiff must show that the defendant, among other acts, either (1) dispossessed the plaintiff of

the chattel; or (2) deprived the plaintiff "of the use of the chattel for a substantial time." *Poff v.

Hayes*, 763 So. 2d 234, 238–39 (Ala. 2000) (citing Restatement (Second) of Torts §§ 218, 221

(1965)). To be actionable, dispossession need not be intentional; rather, trespass to chattels may

occur even when a person "tak[es] another man's hat by mistake and return[s] it within two

minutes upon discovery." *Poff*, 763 So. 2d at 239 (citing Restatement (Second) of Torts §§ 222

cmt. a). In short, dispossession always "subjects the actor to liability for at least nominal

damages for the interference with the possession." *Poff*, 763 So. 2d at 239 (citing Restatement

(Second) of Torts § 222 cmt. a).

The Euroboor Plaintiffs claim that Ms. Grafova committed the tort of trespass to chattel

by (1) exceeding her authorized access to Euroboor USA's bank account; (2) interfering with

Euroboor USA's computer system; (3) making unauthorized charges on Euroboor credit cards; and (4) retaining possession of Euroboor FZC's bank token after her termination. (Doc. 211 at 27). Ms. Grafova moves for summary judgment as to each act. The court grants in part and denies in part.

First, the court finds that Ms. Grafova did not dispossess Mr. Koster or the Euroboor entities of any money from any Euroboor bank account because Mr. Koster admitted that he cancelled the disputed transaction before Ms. Grafova withdrew any money. (Doc. 205-1 at 21). So the Euroboor Plaintiffs do not have a claim for trespass to chattels based on Ms. Grafova's alleged unauthorized access to Euroboor bank accounts.

Next, as to Ms. Grafova's alleged misuse of Euroboor credit cards, Mr. Koster could only recall one instance of such misuse: that Ms. Grafova spent $4995 on a business seminar, but that she "made it ok again." (Doc. 205-1 at 53). Regardless, Ms. Grafova *did* dispossess one of the Euroboor entities[9] of that money before she returned it, so a jury could conclude that the Euroboor entity to which the credit card belonged is entitled to nominal damages for this dispossession. *Poff*, 763 So. 2d at 239.

Next, Euroboor USA has presented evidence suggesting that Ms. Grafova intentionally locked Euroboor USA and its employees out of their QuickBooks accounts, causing them to lose at least half a day of work. (Doc. 220-2 at 3). Ms. Grafova testified that she merely signed out of QuickBooks as an administrator and did not intend to lock the other employees out of QuickBooks. (Doc. 205-2 at 82). But Alabama law provides for trespass to chattels liability even when dispossession occurs "by mistake." *See Poff*, 763 So. 2d at 239. Thus, a jury could conclude that Ms. Grafova "deprived [Euroboor USA] the use" of its QuickBooks account, in

---

[9] The record does not indicate to which Euroboor entity this credit card belonged.

which case Euroboor USA would be entitled to at least nominal damages. *See* Restatement (Second) of Torts, § 218 (1965).

Euroboor's final trespass to chattels claim is for Ms. Grafova's possession of Euroboor FZC's bank token after her termination. Ms. Grafova responds that she offered to return the bank token, and the parties do not dispute that Euroboor FZC did not respond to Ms. Grafova's offer. (Doc. 37-2 at 33–34). Ms. Grafova also points out that any alleged dispossession did not prevent Euroboor FZC from making payments. (Doc. 225 at 8). But trespass to chattels liability may exist even when dispossession is "minor and unimportant" and even though the defendant tried to return the dispossessed item. *See Poff*, 763 So. 2d at 239. Thus, a jury could reasonably find that Ms. Grafova wrongfully dispossessed Euroboor FZC of the bank token.

Finally, Plaintiffs Euroboor BV, Euroboor USA, and Mr. Koster brought conversion claims in very general terms. (Doc. 105 at 18, Count VI). But those parties' response brief states that they now abandon all conversion claims. (Doc. 211 at 29).

So the court will **DENY** Ms. Grafova's motion for summary judgment on the Euroboor Plaintiffs' trespass to chattels claim (Count Three); the Euroboor Plaintiffs may be entitled to at least nominal damages for Ms. Grafova's allegedly intentional interference with Euroboor USA's QuickBooks system, her alleged misuse of a Euroboor credit card, and her possession of the Euroboor FZC bank token. The court will **GRANT** Ms. Grafova's motion on the Euroboor Plaintiffs' Count Three as to her alleged use of Euroboor USA's bank account and as to Plaintiffs' Count Six for conversion.

### ii.    Tortious Interference with Business Relations

The Euroboor Plaintiffs allege that Ms. Grafova tortiously interfered with several of their business relationships by sending the allegedly defamatory email and by posting it to Facebook.

Ms. Grafova moves for summary judgment as to this claim. (Doc. 204 at 26). The court agrees with Ms. Grafova.

Under Alabama law, a party alleging tortious interference with business relations must show "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Engineered Cooling Servs., Inc. v. Star Serv., Inc. of Mobile*, 108 So. 3d 1022, 1028 (Ala. Civ. App. 2012) (quoting *White Sands Grp., LLV v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009)).

First, Mr. Koster admitted that the majority of his business contacts that learned of the information contained in Ms. Grafova's email did not actually *receive* the email from Ms. Grafova. *See, e.g.*, (doc. 205-5 at 47–48). In Mr. Koster's words, "[t]he gossip went around. Ms. Grafova sent a message in the world. So, maybe my people talk, but I don't know who. People talk." (Doc. 205-5 at 48).

No jury could reasonably conclude that Ms. Grafova *intentionally interfered* with these business relationships where she did not personally contact the other parties to those relationships. *See, e.g.*, *White Sands*, 32 So. 3d at 17 (evidence of intentional interference where defendant personally "put pressure on" the other party to the business relationship to keep a deal from closing); *Engineered Cooling*, 108 So. 3d at 1029 (defendant intentionally interfered with a contractual relationship where he personally induced a party to the contract to breach the contract's confidentiality clause).

Mr. Koster testified that only two recipients of Ms. Grafova's email were not Euroboor employees or family members of Mr. Koster: (1) a realtor in Birmingham and (2) Euroboor's "tax and legal advisor." (Doc. 207-1 at 5–6). As to the post on Ms. Dolsma's Facebook wall, Mr.

Koster testified that a couple of Euroboor suppliers and customers were Facebook "friends" with Ms. Dolsma and accordingly could see Ms. Grafova's post on Ms. Dolsma's Facebook wall. (Doc. 205-1 at 27).

And as to the parties to business relationships with Mr. Koster or the Euroboor entities that did receive Ms. Grafova's email, the Euroboor Plaintiffs have not proven any damages arising from Ms. Grafova's alleged interference with those relationships. But they must prove damages to survive summary judgment on a tortious interference claim. *See, e.g.*, *Engineered Cooling*, 108 So. 3d at 1028. The Euroboor Plaintiffs argue that Alabama law entitles them to damages for the "emotional distress or actual harm to reputation resulting from Ms. Grafova's tortious interference" (doc. 211 at 29); but Mr. Koster did not testify to any emotional damage (doc. 205-5 at 49), nor has he offered evidence of any actual harm to his or any of the Euroboor entities' reputations. (Doc. 205-5 at 49).

Finally, the Euroboor Plaintiffs argue that Alabama law entitles them "to at least an award of nominal damages." (Doc. 211 at 29). But under Alabama law, to recover nominal damages, the plaintiff must prove "that he or she *was damaged* by a defendant's intentional interference with the plaintiff's contractual relations but cannot prove the specific amount of his…damage." *Engineered Cooling*, 108 So. 3d at 1030 (emphasis added). Even assuming that Ms. Grafova's email constituted an "intentional interference" with a business relationship, the Euroboor Plaintiffs have not offered evidence of any damage they suffered as a result of that intentional interference.

So the court will **GRANT** Ms. Grafova's motion as to the Euroboor Plaintiffs' Count Four, for tortious interference with business relations.

### iii.   Defamation

The Euroboor Plaintiffs claim that Ms. Grafova defamed them by sending the email discussed above and by posting it to Facebook. This claim likewise fails.

To survive summary judgment on a defamation claim under Alabama law, the plaintiff must show "(1) that the defendant was at least negligent, (2) in publishing (3) a false and defamatory statement to another (4) concerning the plaintiff, (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Bell v. Smith*, 281 So. 3d 1247, 1253 (Ala. 2019).

Alabama law considers an allegedly defamatory email to fall under the category of libel because an email is "written or printed." *See Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978). Whether a plaintiff must prove damages as part of his prima facie case of defamation depends on whether the allegedly libelous statement is actionable per se under Alabama law. If the statement is actionable per se, the plaintiff is relieved "of the requirement of proving actual harm to reputation or any other damage in order to recover nominal or compensatory damages." *Liberty Nat'l Life Ins. Co. v. Daugherty*, 840 So. 2d 152, 157 (Ala. 2002) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1092 (Ala. 1988)) (internal quotation marks omitted).

### a.   Defamation Per Se

An allegedly defamatory written statement is actionable per se under Alabama law where "the language used exposes the plaintiff to public ridicule or contempt, [even] though it does not embody an accusation of a crime[.]" *Daugherty*, 840 So. 2d at 157 (quoting *Ceravolo*, 364 So. 2d at 1156–57). In determining whether a statement constitutes defamation per se, the court must first decide as a matter of law whether the statement or statements are "reasonably capable of a

defamatory meaning." *Bell*, 281 So. 3d at 1254 (quoting *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 346 (Ala. 2007)).

And in making the determination of whether a statement is "reasonably capable of a defamatory meaning," the court must consider the writing *as a whole* and give the statement the "meaning which would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a 'common mind.'" *Bell*, 281 So. 3d at 1254 n.4 (quoting *Kelly v. Arrington*, 624 So. 2d 546, 548 (Ala. 1993)). Importantly, statements of opinion do not constitute defamation per se. *Bell*, 281 So. 3d at 1255. And "[w]hether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties." *Bell*, 281 So. 3d at 1255 (quoting *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 846–47 (Ala. 1993)).

The Euroboor Plaintiffs point out several of Ms. Grafova's statements in the email that they claim constitute defamation per se:

- Ms. Grafova's statement that Mr. Koster's brain was "definitely damaged by 15 years usage of heavy drugs," (doc. 205-1 at 101);

- Ms. Grafova's statement that as CFO she saw Euroboor FZC's situation and she accordingly knew that "there [was] no way I can get my money back without making Mr. Koster broke and put [*sic*] a lot people who work in Euroboor group in risk to lose a job," (doc. 205-1 at 102);

- Ms. Grafova's statements that "there is no way that the company will grow and becomes [*sic*] successful with a 'leader' like Mr. Koster.…Euroboor is in a serious decline and is falling apart. Mr. Koster will spend all his time and energy to hurt me as much as possible but not to run the company. I know what I am saying, I observed many ways he had during this marriage." (Doc. 205-1 at 102).

The court concludes that these statements are not reasonably capable of a defamatory meaning because, to the extent that the statements are false, they constitute the hyperbolic

opinions of Ms. Grafova. The court must interpret these statements in light of "all the circumstances of the particular case," including that Ms. Grafova's marriage and business relationships with Mr. Koster had recently failed in a very public manner. *See Bell*, 281 So. 3d at 1255. Given that context, a "listener of ordinary or average intelligence" would find her statements to be mere opinion, rather than actionable fact. *Id.*

As for Ms. Grafova's statements about Mr. Koster's drug use, Mr. Koster admitted to using marijuana as a teenager and to using cocaine "occasionally at a party maybe five, six, seven times in my life." (Doc. 205-1 at 6). Ms. Grafova stated her *opinion* that such usage constituted "heavy" usage; given Mr. Koster's admission to using drugs, he cannot now attack as defamatory Ms. Grafova's opinion as to the effects of his drug usage.

And as to Ms. Grafova's statements about the financial situation of Euroboor FZC, Mr. Koster admitted that Euroboor FZC did not have the money to repay Ms. Grafova's loans. (Doc. 205-1 at 7) (Mr. Koster's testimony that "the company . . . couldn't afford that."). A true statement is not defamatory as a matter of law, so Euroboor's claim fails as to these statements also. *See Bell*, 281 So. 3d at 1253 ("To establish a prima facie case of defamation, the plaintiff must show . . . a false and defamatory statement. . . .").

The remainder of Ms. Grafova's statements about the state of the Euroboor group with Mr. Koster at the helm constitute Ms. Grafova's opinions that no reasonable jury could find defamatory. Ms. Grafova began the email by informing the recipients that she recently told Mr. Koster that she did not "love him anymore" and wanted "to divorce him." (Doc. 205-1 at 101). And she sprinkled the rest of the email with statements pointing out Mr. Koster's alleged failings in their personal relationship. *See* (doc. 205-1 at 101–02). Given the context of the document as a whole, a reasonable person reading Ms. Grafova's email would conclude that Ms. Grafova was

expressing her opinion about Mr. Koster and his companies in light of their recently-failed marriage. *See Bell*, 281 So. 3d at 1254. Accordingly, none of Ms. Grafova's statements constitute defamation per se.

### b.      Defamation Per Quod

Because the Euroboor Plaintiffs cannot show that any of Ms. Grafova's allegedly defamatory statements constituted defamation per se, the Euroboor plaintiffs can only survive summary judgment by showing that those statements constituted defamation per quod. But claims of defamation per quod require "allegations and proof of special harm." *See Bell v. Smith*, 281 So. 3d 1247, 1253 (Ala. 2019).

Here, any defamation claim by the Euroboor Plaintiffs based on a theory of defamation per quod fails because—as discussed above with relation to the tortious interference claim—the Euroboor Plaintiffs cannot prove *any* damages that Ms. Grafova's email or Facebook post caused them.

Because no reasonable person would find Ms. Grafova's statements reasonably capable of a defamatory meaning, the Euroboor Plaintiffs cannot recover under a theory of defamation per se. And because the Euroboor Plaintiffs cannot prove damages, they cannot recover under a defamation per quod theory, either. The court will **GRANT** Ms. Grafova's motion as to the Euroboor Plaintiffs' Count Five, for defamation.

### iv.      Negligence and Wantonness; Breach of Fiduciary Duty

The Euroboor Plaintiffs also claim that the actions Ms. Grafova took around the time of her termination from the Euroboor entities—including sending the allegedly defamatory email and posting it on Facebook; failing to return company property; attempting to access Euroboor

46

USA's bank account; and disabling Euroboor USA's QuickBooks account—constitute negligence and wantonness, as well as breach of fiduciary duty. These claims fail.

To survive summary judgment on a negligence claim in Alabama, a plaintiff must present evidence of "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Hilyer v. Fortier*, 227 So. 3d 13, 22 (Ala. 2017) (quoting *Lemley v. Wilson*, 178 So. 3d 834, 841–42 (Ala. 2015)). And to survive summary judgment on a breach of fiduciary duty claim in Alabama, a plaintiff must show "(1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damages suffered as a result of the breach." *Regions Bank v. Lowery*, 101 So. 3d 210, 219 (Ala. 2012) (citing *Hensley v. Poole*, 910 So. 2d 96, 106 (Ala. 2005)).

### a.     Euroboor USA

Euroboor USA cannot maintain a negligence claim or a breach of fiduciary duty claim against Ms. Grafova because it cannot show that it suffered any damages from Ms. Grafova's allegedly tortious actions, as discussed above in relation to the trespass to chattels and tortious interference claims.

### b.     Euroboor BV

Euroboor BV's negligence, wantonness, and breach of fiduciary duty claims against Ms. Grafova fail because the court respects, under the doctrine of comity, the Dutch court's determinations as to Ms. Grafova's termination from Euroboor BV. *See* (doc. 205-11 at 21–39).

Under the law of the Eleventh Circuit, "[i]nternational comity serves as a guide to federal courts where the issues to be resolved are entangled in international relations." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004) (quoting *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996)) (internal quotation marks omitted). Specifically, "[i]t

is an abstention doctrine: A federal court has jurisdiction but defers to the judgment of an alternative forum." *Ungaro-Benages*, 379 F.3d at 1237 (citing *Turner Entm't Co. v. Degeto Film*, 25 F.3d 1512, 1518 (11th Cir. 1994)).

The doctrine "reflects the extent to which the law of one nation, as put in force within its territory…by judicial decree, shall be allowed to operate within the dominion of another nation." *Ungaro-Benages*, 379 F.3d at 1237 (quoting *Hilton v. Guyot*, 159 U.S. 113, 163 (1895)) (internal quotation marks omitted). As the Second Circuit—quoting a British court—poetically put it, "international comity is clearly concerned with maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'" *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.*, 412 F.3d 418, 423 (2d Cir. 2005) (quoting *Brit. Airways Bd. v. Laker Airways Ltd.*, E.C.C. 36, 41 (Eng. C.A. 1984)).

Courts in the Eleventh Circuit apply the doctrine both prospectively and retrospectively. *Ungaro-Benages*, 379 F.3d at 1238. Because Ms. Grafova asks this court to grant her summary judgment on Euroboor BV's breach of contract and breach of fiduciary duty claims in deference to the *final* judgment of a Dutch court, this court will apply the doctrine retrospectively. *See Ungaro-Benages*, 379 F.3d at 1238. And "[w]hen applied retrospectively, domestic courts consider whether to respect the judgment of a foreign tribunal or to defer to *parallel* foreign proceedings." *Ungaro-Benages*, 379 F.3d at 1238 (emphasis added).

A court may find the "parallelism" requirement satisfied even if the two cases are not exactly identical, so long as they "involve *significantly common* issues and parties. *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1224 (11th Cir. 1999) (emphasis added). And more recently, the Eleventh Circuit has found parallelism between a domestic case and a foreign case where the

two cases "[arose] out of the same nucleus of operative facts" such that the federal court's exercise of jurisdiction over the federal case would constitute a "collateral attack" on the judgment of the foreign court. *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259 (11th Cir. 2006) (citing *Miller v. Meinhard–Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972)) ("Even though an action *has an independent purpose and contemplates some other relief*, it is a collateral attack if it must in some fashion overrule a previous judgment") (emphasis added).

The Eleventh Circuit has described the remainder of the analysis applicable to a retrospective application of the doctrine:

> [F]ederal courts evaluate three factors: (1) whether the foreign court was competent and used "proceedings consistent with civilized jurisprudence," (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just. Courts also consider whether the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments.

*Ungaro-Benages*, 379 F.3d at 1238 (quoting *Turner Entm't*, 25 F.3d at 1519, 1521) (internal citations omitted).

And finally, as this court stated in its previous Memorandum Opinion in this case when it dismissed Ms. Grafova's conversion counterclaim on international comity grounds: the parties "cannot bounce from jurisdiction to jurisdiction seeking different remedies for the same claim. . . . [S]uing [each other] in the United States for the *same* conduct regarding the *same* [property] would inevitably end in a judgment that is at best duplicative, and at worst contradictory, to the Dutch judgment." (Doc. 88 at 21–22) (emphasis in original).

Euroboor BV argues that this court should not apply the international comity doctrine to its claims against Ms. Grafova for negligence, wantonness, and breach of fiduciary duty because the Dutch court only adjudicated claims for *breach of contract*, not *tort* claims; in other words,

Euroboor BV argues that this case and the Dutch case do not meet the Eleventh Circuit's "parallelism" requirement for the application of the international comity doctrine.

But this argument fails because courts in the Eleventh Circuit do not consider the causes of action at issue in the foreign case versus the domestic case in determining whether to apply the international comity doctrine. The Eleventh Circuit inspects whether the two cases arise "out of the same nucleus of operative facts[.]" *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259 (11th Cir. 2006) (citing *Miller v. Meinhard–Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972)). Put another way, courts should not apply the international comity doctrine if the two actions involve "materially different issues, documents, and parties." *Seguros Del Estado, S.A. v. Sci. Games, Inc.*, 262 F.3d 1164, 1170 (11th Cir. 2001).

This action and the action in the Netherlands both arise out of the same nucleus of operative facts: the circumstances surrounding Ms. Grafova's termination from Euroboor BV. *See Daewoo*, 459 F.3d at 1259. In fact, Ms. Grafova and Euroboor BV litigated in the Dutch court a variety of issues related to Ms. Grafova's termination from Euroboor BV, including (1) whether Ms. Grafova's email constituted a breach of the confidentiality clause of her employment contract with Euroboor BV; (2) wage and hour issues between Ms. Grafova and Euroboor BV; (3) the costs Mr. Koster incurred traveling to the United States to cancel the withdrawal Ms. Grafova attempted to make from Euroboor USA's bank account; and (4) visa fees that Euroboor BV incurred. (Doc. 205-11 at 35–36).

Additionally, the same parties litigated these issues before the Dutch court: Ms. Grafova and Euroboor BV. And the Dutch case involved many of the same issues, including the effect of Ms. Grafova's defamatory email and issues related to the amount of time Ms. Grafova spent at work. (Doc. 205-11 at 35–36).

50

Finally, the court's exercise of jurisdiction over Euroboor BV's claims for negligence and wantonness against Ms. Grafova arising out of her employment with Euroboor BV would—put in the words this court used when previously granting comity to a decision of a Dutch court— "inevitably end in a judgment that is at best duplicative, and at worst contradictory, to the Dutch judgment." (Doc. 88 at 21–22). *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004) (when deciding whether to abstain from hearing a claim on international comity grounds, courts should consider "whether there is a prospect of conflicting judgments") (quoting *Turner Entm't Co. v. Degeto Film*, 25 F.3d 1512, 1518 (11th Cir. 1994)).

In the words of this court, the Euroboor Plaintiffs "cannot bounce from jurisdiction to jurisdiction" seeking relief for the same acts. (Doc. 88 at 21–22). The Dutch court already adjudicated Euroboor BV's claim arising out of the circumstances surrounding its termination of Ms. Grafova; that court found that Ms. Grafova breached the confidentiality clause in her employment contract with Euroboor BV and ordered her to pay it €2,000 for her breach. The Euroboor Plaintiffs cannot now turn to this court for additional relief arising from the same circumstances. Euroboor BV should have brought any claim it had against Ms. Grafova arising out of her employment with Euroboor BV in the Dutch action. *See Daewoo*, 459 F.3d at 1259.

Thus, the court will **GRANT** Ms. Grafova's motion for summary judgment on the Euroboor Plaintiffs' claims for negligence and wantonness (Count Seven) and breach of fiduciary duty (Count Eight).

### v.    Breach of Contract

Finally, the Euroboor Plaintiffs claim that Ms. Grafova breached her employment contracts with Euroboor USA and Euroboor BV (Count Ten) by sending the allegedly

defamatory email, failing to return company property, and failing to spend an average of 40 hours per week at work. This also claim fails.

### a.    Euroboor USA

The parties disagree as to whether the Euroboor Plaintiffs' breach of contract claim against Ms. Grafova included a claim against her for breaching an employment agreement with Euroboor USA, because the amended complaint never alleged that Ms. Grafova breached an employment contract with Euroboor USA or even had an employment contract with Euroboor USA.

The court concludes that the Euroboor Plaintiffs' Amended Complaint does not contain a claim against Ms. Grafova for breach of any employment contract with Euroboor USA. True, both Euroboor BV and Euroboor USA "demand[ed] compensatory and punitive damages against Ms. Grafova" for her breach of contract, but the *facts* alleged in Count Ten only plausibly show that Ms. Grafova breached an employment contract with *Euroboor BV*. In other words, the Euroboor Plaintiffs do not allege *anywhere* in the Second Amended Complaint that Ms. Grafova entered into an employment contract with Euroboor USA. *See, e.g.*, (doc. 105 at 23–24) ("Ms. Grafova entered into an employment agreement with *Euroboor BV*").

Courts must look to the *facts* alleged in the plaintiff's complaint—as opposed to the plaintiff's *legal theories*—to determine whether the plaintiff sufficiently stated a claim under a cause of action. *E.g.*, *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997) ("The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim") (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981)).

And because the Euroboor Plaintiffs' Second Amended Complaint does not allege that Ms. Grafova had an employment agreement with Euroboor USA, the Euroboor Plaintiffs cannot maintain an action against Ms. Grafova for a breach of such agreement. *See, e.g.*, *Harp Law, LLC v. LexisNexis*, 196 So. 3d 1219, 1224 (Ala. Civ. App. 2015) ("to recover on a breach-of-contract claim, a party must establish . . . *the existence of a valid contract binding the parties*") (citing *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011)) (emphasis added).

### b.      Euroboor BV

As to Euroboor BV's breach of contract claim against Ms. Grafova, the parties have already litigated that claim in the Dutch court; this court will grant comity to the Dutch court's resolution of the contract issues between Ms. Grafova and Euroboor BV. As explained above in relation to the Euroboor Plaintiffs' claims for negligence, wantonness, and breach of fiduciary duty, Euroboor BV counterclaimed against Ms. Grafova in the Dutch case and alleged that Ms. Grafova breached her employment agreement with Euroboor BV. (Doc. 205-11 at 35–36). The Dutch court already determined the amount Ms. Grafova owed Euroboor BV for breaching the confidentiality clause in her employment agreement by sending the allegedly defamatory email. The court also determined various wage issues outstanding between Ms. Grafova and Euroboor BV. (Doc. 205-11 at 35–36).

If any other issues remain outstanding between Euroboor BV and Ms. Grafova regarding Ms. Grafova's employment contract, Euroboor BV should have brought those in the Dutch case. Its failure to do so does not prevent this court from granting comity to the Dutch court's order and abstaining to exercise jurisdiction over Euroboor BV's breach of contract claim. As already explained, the Dutch action and this case arise from the same nucleus of operative facts, the same parties litigated the issues, and a judgment in this court would run the risk of contradicting the

Dutch court's determination. This case thus meets all the markers for applying the comity doctrine. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1259 (11th Cir. 2006).

Accordingly, the court will **GRANT** Ms. Grafova's motion for summary judgment as to Euroboor BV and Euroboor USA's Count Ten, for breach of contract.

## V.    Conclusion

For the reasons explained above, the court will **DENY** Ms. Grafova's motion to strike. (Doc. 213).

As to Ms. Grafova's motion for summary judgment, (docs. 197, 203), the court will **GRANT** the motion as to the Euroboor Plaintiffs' Counts Two, Four, Five, Six, Seven, Eight, and Ten and will **ENTER SUMMARY JUDGMENT** in favor of Ms. Grafova and against Mr. Koster, Euroboor BV, and Euroboor USA on those Counts.

Further, the court will **GRANT** Ms. Grafova's motion, (docs. 197, 203), as to her Counterclaim Count Four and will **ENTER SUMMARY JUDGMENT** in favor of Ms. Grafova and against Euroboor FZC to the extent that Euroboor FZC breached the loans by not paying Ms. Grafova the interest and principal due her on December 31, 2019. As of March 31, 2021, Euroboor FZC undisputedly owed Ms. Grafova a total of $956,901.59 on the loans and interest, but compounded quarterly interest will continue to accrue at the contractual rate of 6%. The court will also hold a hearing to determine the penalties that Euroboor FZC owes Ms. Grafova. The court will **DENY** Ms. Grafova's motion on her Counterclaim Count Four to the extent that she asks the court to find that Euroboor FZC breached the loans each quarter that it failed to pay her interest, because the maximum penalty amount under *any* interpretation of the loan agreements is excessive as a matter of Dutch law.

Finally, the court will **DENY IN PART** Ms. Grafova's motion, (docs. 197, 203), as to the Euroboor Plaintiffs' Count Three for trespass to chattels because a reasonable jury could conclude that Ms. Grafova is liable to Euroboor USA for her use of the QuickBooks account, that she is liable to Euroboor for her use of a company credit card, and that she is liable to Euroboor FZC for her possession of the bank token. But the court **GRANTS IN PART** Ms. Grafova's motion as to all other trespass to chattels claims.

As to the Euroboor Plaintiffs' motion for summary judgment, (doc. 199), the court will **GRANT IN PART** the motion and will **ENTER SUMMARY JUDGMENT** in favor of Mr. Koster and against Ms. Grafova on Ms. Grafova's Counterclaim Count Four to the extent that Mr. Koster was not a party to the loan agreements. The court will **DENY** the Euroboor Plaintiffs' motions as to Ms. Grafova's fraud claim (Counterclaim Count Three).

Further, the court will **GRANT IN PART** the Euroboor Plaintiffs' motion for summary judgment, (doc. 199), as to Ms. Grafova's allegations to pierce the corporate veil, to the extent that Ms. Grafova may not pierce the corporate veils of Euroboor USA and Euroboor BV. But the court will **DENY IN PART** that motion to the extent that Ms. Grafova may argue at trial that she is entitled to pierce the corporate veil of Euroboor FZC.

And as to Euroboor FZC's motion for summary judgment, (doc. 201), the court will **GRANT** the motion to the extent that Euroboor FZC does not owe Ms. Grafova the maximum penalty amount under any interpretation of the loan agreements. The court will **DENY** Euroboor FZC's motion to the extent that it requests a finding of no penalties.

In short, the Euroboor Plaintiffs' remaining claims are as follows: claims for violation of the Computer Fraud and Abuse Act, (doc. 105, Count I); for trespass to chattels, (doc. 105, Count III); and for fraud, (doc. 105, Count IX).

And Ms. Grafova's remaining claims are as follows: claims for fraud against Euroboor BV, Euroboor USA, and Mr. Koster (doc. 56, Count I); for fraud against Euroboor BV, Euroboor FZC, and Mr. Koster, (doc. 56, Count III); for breach of contract against Euroboor FZC, (doc 56, Count IV); and for piercing the corporate veil against Euroboor FZC, (doc. 56, ¶ 82). As to the breach of contract claim, the court finds that $956,901.59 was due as of March 31, 2021[10] and that compounded quarterly interest should continue to accrue at the contractual rate of 6% annum. Finally, the court will determine at a later hearing the appropriate penalty that Euroboor FZC owes Ms. Grafova.

**DONE** and **ORDERED** this 23rd day of September, 2021.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE

---

[10] As stated at note 3, *supra*, the court estimates that, as of September 23, 2021, the amount due has grown to $788,691.21 for the loan of $560,000 plus interest, and $197,172.80 for the loan of $140,000 plus interest. This produces a total of $985,864.01.