FILED
2022 Aug-01  PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **EUROBOOR B.V.,** *et al.*, | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **v.** | ) |
| | )    **CIVIL ACTION NO.** |
| **ELENA GRAFOVA,** | )    **2:17-cv-2157-KOB** |
| **Counterclaim Plaintiff.** | ) |

## MEMORANDUM OPINION

The saga continues. *See* (Docs. 88, 231). The court conducted a three-day Final Hearing in this case beginning on May 16, 2022. The sole claim remaining for the hearing involved Ms. Grafova's counterclaim for breach of contract concerning two loans to Euroboor FZC; the court previously ruled that Euroboor FZC had breached both contracts. (Doc. 231 at 24). The hearing addressed two issues: (1) the amount of penalties that Euroboor FZC owed Ms. Grafova under the loans based on Dutch law; and (2) whether UAE law entitles Ms. Grafova to pierce Euroboor FZC's corporate veil to hold Mr. Koster personally liable for any judgment against Euroboor FZC. (Doc. 290 at 3). Before the hearing, the parties stipulated to the applicable provisions of Dutch and UAE law. *See* (doc. 290 at 8). And the parties stipulated that, as of May 16, 2022, Euroboor FZC owed Ms. Grafova $1,023,134.48 as total principal and interest on both loans. (Doc. 328).

At the close of the hearing, the court instructed the parties to file briefs reflecting their closing arguments and summaries of the evidence presented. The court told the parties to point out any relevant exhibits previously submitted but left unaddressed in the hearing. The court instructed that the parties could not later rely on exhibits—specifically for purposes of an appeal—that they failed to address at the hearing or failed to identify in their final briefs. Ms. Grafova submitted a final brief identifying roughly fifteen additional exhibits. (Doc. 337). Mr. Koster filed a brief relying on four Dutch cases but no additional exhibits. (Doc. 338). The court has considered that additional case law and exhibits along with the testimony and exhibits presented at the hearing.

For the reasons explained below, the court awards Ms. Grafova penalties in the amount of $168,213.82, and it will also impose an additional daily penalty in the event of Mr. Koster and Euroboor's continued refusal to pay or agree to a reasonable payment plan within 30 days of this order, i.e., August 31, 2022. The court also finds that Ms. Grafova may pierce Euroboor FZC's veil to hold Mr. Koster personally liable under UAE law.

## I.   **The Loan Agreements**

The parties ask the court to mitigate the amount of penalties owed under the loan agreements between Ms. Grafova and Euroboor FZC. Those agreements, which contained identical terms, provide:

**Article 2. Interest**

2.1 Debtor shall be liable to pay to creditor an interest rate of 6 (six) % per annum over the principal sum and/or the remaining debt amount.

2.2. The interest is payable quarterly, commencing on January 1, 2016.

2.3 If and to the extent that the interest has not been paid, the interest shall be added to the principal sum and shall be interest-bearing.

**Article 3. Repayment**

Repayment of the principal sum shall take place on December 31, 2019.

**Article 4. Immediate payability and penalty**

4.1 Debtor shall commit to immediate repayment to creditor of the principal sum and/or the remaining debt amount inclusive of interest due, as well as penalties and costs possibly due without notice if the creditor so requires, in the following cases:

. . .

      e. if debtor fails to fulfill or violates any article within this agreement, without prejudice to that stipulated in sub 2 of this article;

. . .

4.2 The party that breaches any provision of this agreement, forfeits an immediately due and payable penalty to the amount of USD 5.000 (in words: five thousand US Dollars) per occurrence, without injunction or proof of default is required. . . .

4.3 Aforementioned penalty shall be increased by an amount of USD 500 (in words: five hundred US Dollars), per day of continuance of the breach or the failure.

(Pl.'s Ex. 2; Pl.'s Ex. 3).

At the summary judgment stage, the court found a plain interpretation of these terms ($5,000 per breach plus $500 per day) to produce an unreasonably high penalty amount under Dutch law. (Doc. 231 at 26). So, the court now addresses the extent to which it will mitigate the penalties Euroboor FZC owes Ms. Grafova.

## II.   Penalties Under Dutch Law

Before the final hearing, the parties stipulated that the Dutch principles of "reasonableness and fairness" should guide the court's mitigation of penalties. (Doc. 290 at 8). A reasonableness determination under Dutch law considers the following factors:

> (1) the amount of the actual loss/damage suffered relative to the amount of the penalty;
>
> (2) the nature of the agreement;
>
> (3) the contents and purport of the penalty clause; and
>
> (4) the circumstances under which the penalty clause was invoked.

(Doc. 290 at 8) (citing *Turan B.V. v. Easystaff Payroll Serv.*, Case No. 17/00024, ¶ 3.4.1 (Dutch Sup. Ct. 2018) (doc. 207-105 at 5)).

After considering the evidence, the court finds $168,213.82 to be a reasonable and fair penalty that Euroboor FZC must pay Ms. Grafova under the loans. The court calculates that amount based on a $5,000 penalty per nine breaches of each of the two loan agreements from January 2018 until December 31, 2019 (for a subtotal of $90,000); it adds to that amount a 9% annual penalty

from September 23, 2021—when this court ruled that Euroboor FZC breached the contracts—until the date of this opinion, August 1, 2022.

As explained below, the court's conclusion rests on three categories of evidence that the parties presented: (1) evidence of the parties' course of dealings concerning loan agreements; (2) evidence of Ms. Grafova's repeated requests in November and December 2017 that Euroboor FZC begin repaying the loans' interest and, later, to pay the loans' full balance; and (3) evidence of Mr. Koster and Euroboor FZC's flagrant refusal to repay the loans, while depleting Euroboor FZC's resources by transferring them to Euroboor MEEBS, and despite repaying or forgiving Euroboor FZC's other creditors, including payments to Mr. Koster, even after this court declared that Euroboor FZC breached the loans and the basic amount due as of that date. The court will discuss each category of evidence below.

### A. The Parties' Course of Dealings Concerning Loans

The court has previously noted that a plain reading of the loans indicates that Euroboor FZC should have paid Ms. Grafova interest each quarter as it accrued. *See* (Doc. 88 at 24). But Euroboor FZC presented credible evidence that Euroboor typically did not pay quarterly interest as that quarter's interest accrued under similar language in loans between Euroboor entities, absent a request for quarterly interest payments.

For example, Euroboor's counsel questioned Ms. Grafova about how the Euroboor entities typically handled the principal, interest, and penalties of inter-company loans. She testified that the Euroboor entities often used loan agreements with terms similar to hers. She stated that Euroboor's accounting systems reflected the accruing interest beginning at the end of the first quarter after the loan was created, and compounding each quarter thereafter. But she admitted that Euroboor's debtors never paid the interest on those loans before they came due and that Euroboor did not typically seek penalties for such non-payment.

Euroboor also presented a financial statement of Euroboor FZC from January 2017 that identified the principal of the loans from Ms. Grafova, the interest accrued to that date (roughly $53,000), but *excluding* any mention of penalties. (Def. Ex. 65, Bates Euroboor-0032975); *see also* (Def. Ex. 32, report for May 2017, stating the same). On cross-examination Ms. Grafova testified that she reviewed this report in her managerial role at Euroboor in 2017 and did not request adding any amount of penalties for non-payment of the interest *at that time*. Of course, those financial statements predate Ms. Grafova's demand of quarterly interest payments and for payment in full.

Based on this evidence, the court finds that the Euroboor parties—at Ms. Grafova's approval—typically (1) did not pay quarterly interest, despite language

in the loan documents providing for such payments, and (2) did not impose penalties for failure to pay a loan's quarterly interest as it accrued.

### B.  Ms. Grafova's Requests for Repayment of Interest

Despite the court's conclusion above, the terms of the loans still stated in unambiguous terms that "the interest is payable quarterly, commencing on January 1, 2016." (Pl's Ex. 2, ¶ 2.2). And the loans stated that Ms. Grafova could seek immediate repayment of the principal and interest, "as well as penalties," in the event that the "debtor fails to fulfill or violates any article within this agreement." (Pl.'s Ex. 2, ¶ 4.1.e). The loans matured on December 31, 2019. (*Id.*).

Emails show that Ms. Grafova requested repayment of the loans' principal and interest numerous times in November and December 2017. On November 17, 2017, Ms. Grafova sent Mr. Koster an email requesting that he pay her "the *interest* amount for my loan." (Pl.'s Ex. 5) (emphasis added). Mr. Koster responded on the same day that "it will take a little longer now to add up all other amounts you owe me and in due time I will present you the calculation." (*Id.*). Then on November 28, 2017, Ms. Grafova sent another email to Mr. Koster requesting that he make "immediate payment of the *principal* sum and the debt amount of the *interest* due." (Def. Ex. 55) (emphasis added). Mr. Koster responded on December 2 that he did "not agree with any allegations contained [in Ms.

Grafova's November 28 email] as the same do not have sufficient legal basis and standing." (*Id.*).

Based on these emails, the court finds that Ms. Grafova properly requested payment of the loans' quarterly interest in November 2017. The loan language unambiguously permitted her to request the interest payments before the loans' maturity date because it stated that interest was "payable quarterly, commencing on January 1, 2016." (Pl.'s Ex. 2, ¶ 2.2). Nothing in Mr. Koster's emailed responses in 2017 or evidence at the final hearing in this case indicated his "legal basis" to dispute Ms. Grafova's request for interest payments.[1] So the court finds that, under the loans' plain language, the interest that Euroboor FZC owed Ms. Grafova became due at the end of the quarter that she emailed her requests— January 1, 2018.

Of course, Euroboor FZC did not pay the interest when it became due January 1, 2018, or at any time until the present. Euroboor FZC's failure to repay the quarterly interest on January 1, 2018 constituted a breach of the loan

---

[1] The court has rejected Mr. Koster's late-in-the-day and legally unfounded argument that he refused to pay out of fear of committing "culpable money laundering" under Dutch law. *See* (doc. 329). The court does not appreciate Mr. Koster's continued efforts to advance that late-in-the-day and meritless argument. *See* (doc. 338 at 5).

agreements, and Euroboor continued to breach the loan agreements for every quarter that it refused to pay Ms. Grafova the interest after that time.[2]

For each of these breaches, the court finds that Euroboor FZC owes $5,000 penalties per loan for each quarter beginning in January 2018, until the loans' maturity date on December 31, 2019. That amount equals eight quarters, times $5,000 per quarter for each of the two loans, for a total penalty of $80,000. As explained below, the court finds this penalty—which the loan documents set forth—reasonable and fair based on the amount of the loans; based on Euroboor FZC's ability to make such interest payments when first requested and when due subsequently; and based on Euroboor FZC's refusal to make those payments, while transferring assets, making larger payments to Mr. Koster, and writing off debts that other creditors owed to it.

Further, the court finds that Euroboor FZC breached the loan agreements by failing to pay the principal and interest owed when the loans matured on December 31, 2019. For this breach, under the language of the loans, the court will impose an additional $5,000 in penalties for each loan ($10,000 total) for Euroboor FZC's failure to pay the full principal and compounded interest when due on the loans' maturity date of December 31, 2019.

---

[2] Also, Euroboor FZC's failure to repay the quarterly interest due January 1, 2018 likely justifies Ms. Grafova's premature acceleration of the loans' principal because Euroboor FZC's refusal to pay "violat[ed] an[] article within this agreement." (Pl.'s Ex. 2, ¶ 4.1.e).

So the court will impose a penalty of $90,000 total for Euroboor FZC's failure to pay the interest from January 2018 to December 2019 and for its failure to pay the total amount owed on December 31, 2019 on both loans. For the reasons explained above, the court finds that this penalty fits both the "nature of the agreement" and the "contents and purport of the [penalty] clause" under Dutch law, as the parties have stipulated. (Doc. 290 at 8) (citing doc. 292-2, *Easystaff* case).

The court rejects Euroboor's argument—presented for the first time in its post-hearing brief[3]—that the court should treat the two loans as "in essence a single loan," producing a penalty amount of $5,000 per quarter, rather than $10,000 per quarter. *See* (doc. 338 at 6). Euroboor presented *no* evidence at the hearing that the parties viewed the two loans as a "single loan," and Euroboor's brief cites no exhibits or testimony to support that view. Rather, the loans had different principal amounts, and the parties executed the loans agreements on different dates with different documents (although with substantially identical language). In fact, Ms. Grafova testified on cross examination that Mr. Koster directed his accountants at Limes International to draft the loan agreements and that she did not negotiate regarding the penalty provisions. And the court notes that

---

[3] The court finds the timing of the parties' post-hearing briefs analogous to reply briefs, in which parties may not present new arguments. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in a reply brief are deemed waived.").

when Ms. Grafova and Mr. Koster discussed the loans at a restaurant on November 11, 2017, Ms. Grafova offered to reduce the interest owed from 6% to 3% *if* Euroboor paid her the principal and interest sooner. (Def.'s Ex. 71). Mr. Koster never acted on that very reasonable offer. So the court finds no reason to absolve Euroboor FZC of half the penalties it owes under the two loan agreements that it drafted.

### C.  *Mr. Koster and Euroboor FZC's Refusal to Repay the Loan Agreements while Paying Other Debts and Paying Mr. Koster*

Mr. Koster himself testified that he treated the loan dispute as a "war" with Ms. Grafova, and the court finds that he executed an effective battle plan that has prevented Ms. Grafova's recovery of money due her since December 31, 2019. As explained below, the evidence presented at the hearing greatly troubled the court for at least four reasons:

1. Euroboor FZC had the financial means to repay Ms. Grafova's loans when due, but instead embarked on a scheme to deplete its own resources;

2. Mr. Koster directed the transfer of personal and other assets of Euroboor FZC to create Euroboor MEEBS, which substantially replaced Euroboor FZC and drained Euroboor FZC of assets with which it could repay Ms. Grafova;

3. Mr. Koster directed Euroboor FZC to pay its debts to other Euroboor-related entities while writing off debts owed it; and

4. Mr. Koster personally received payments from Euroboor FZC that exceeded the amount Euroboor owed to Ms. Grafova, and which Mr. Koster could have directed to pay off the debt owed Ms. Grafova.

### i.  Euroboor FZC's Financial Means

Evidence from the hearing showed that Euroboor FZC could have repaid Ms. Grafova—but chose not to—no later than by the time the loans matured on December 31, 2019.

For example, Mr. Rehman Shahzad, Euroboor FZC's CFO, admitted on cross-examination that Euroboor FZC could have paid, at a minimum, the interest owed to Ms. Grafova around September 2018, when Mr. Koster began to wind down Euroboor FZC. And Mr. Koster testified that his accountants advised him that Euroboor FZC could have paid off the loans' principal and interest within six to eight months after Ms. Grafova's initial requests for payment at the end of 2017. But Mr. Koster chose to wage war instead of repaying the loans.

This testimony accords with Ms. Grafova's evidence of Euroboor FZC's finances. Euroboor FZC's year-end audit for 2019 (dated May 31, 2019) indicated that the company had a total equity of 5.2 million AED and cash reserves of 737,000 AED. (Pl.'s Ex. 34 at 7). And the company's 2020 year-end audit, while showing a decrease in assets, showed its total equity of 1.6 million AED and cash reserves at 40,215 AED. (Pl.'s Ex. 7 at 8). In other words, Euroboor FZC's year-end audits show that the company had positive equity and cash reserves as of May 2018, 2019, and 2020, but deliberately chose not to repay Ms. Grafova.

### ii.   Mr. Koster's Draining Euroboor FZC to Create Euroboor MEEBS

Mr. Koster's replacement of Euroboor FZC with Euroboor MEEBS also supports imposing penalties.

Rehman Shahzad testified that Euroboor FZC began winding down in September or October of 2018 at Mr. Koster's direction, based on the purported legal guidance of APT Consultants. Around that same time, Mr. Koster directed the creation of Euroboor MEEBS, a company that supplied the same materials Euroboor FZC supplied to the same customers, operated primarily with the same employees, assumed Euroboor FZC's lease, and received most of Euroboor FZC's assets. The key difference between these largely identical companies was that Euroboor MEEBS had no debts to Ms. Grafova, and she did not serve as a shareholder of MEEBS. This evidence supports the inference that Mr. Koster created Euroboor MEEBS to avoid repaying Ms. Grafova.

The first red flag for Euroboor FZC's wind-down is who helmed the ship at that time. Before 2018, Euroboor FZC's only two directors were Mr. Koster and Ms. Grafova. But Mr. Koster unilaterally ousted Ms. Grafova as a director on July 4, 2018. (Pl.'s Ex. 54). In other words, Mr. Koster's efforts left him as the sole director when he made key decisions about winding down Euroboor FZC and transferring its business to MEEBS. Even so, Mr. Koster continued to deplete Euroboor FZC's assets by receiving "remuneration" payments for serving as the

13

company's director. (Pl.'s Ex. 33). Mr. Koster admitted that Ms. Grafova never received any such payments as director. Mr. Koster's sole control over both companies, coupled with his declared war on Ms. Grafova, casts serious doubts on the financial decisions made at that time.

The court also has grave concerns about the role of APT Consultants in Euroboor FZC's wind-down. Mr. Koster and Mr. Shahzad testified that they relied on APT Consultants to provide legal advice about how to wind down Euroboor FZC's business. But none of the evidence concerning Euroboor's purported advisors indicates that APT was aware of Ms. Grafova's loans to Euroboor FZC that are at issue in this lawsuit. In fact, the court directly questioned Mr. Shahzad as to whether any Euroboor employees ever told Euroboor's legal or accounting consultants about Ms. Grafova's loans or this lawsuit; he responded that he did not know. And Mr. Shahzad's testimony also left the court with doubts as to whether he had ever received notice of this court's summary judgment ruling that Euroboor FZC *must* pay Ms. Grafova the loans' principal and interest; when the court questioned him about this point, he first testified that he never heard of the court's summary judgment ruling, and then he recalled that he "thought" he had received some notice of the ruling.

Put simply, Euroboor's consultants could not have properly advised the company as to the legality of steps taken to wind down Euroboor FZC *without*

14

knowing about Ms. Grafova's loans and her case to enforce them pending before this court, and specifically about the judgment entered in her favor. The evidence offered at the hearing failed to show that Euroboor or Mr. Koster ever gave information about these matters to APT, on which Mr. Koster relied to insulate the transfers of practically all of Euroboor FZC's assets to avoid paying the lawful debt to Ms. Grafova. Seeking APT's advice—while failing to provide key information about loans, legal claims, and court rulings against the company— undercuts the "reasonableness" of relying on APT's advice and actually demonstrates bad faith, if not outright fraud.

Unsurprisingly, APT Consultants did not provide sound advice. In a December 2018 email exchange between an APT advisor and Mr. Shahzad, APT advises a four-step "sequence" in which Euroboor FZC could pay off its debts and wind down its business. (Pl.'s Ex. 53). Notably, that sequence does *not* include paying back Ms. Grafova's loans that came due in full a year later; it does not mention Ms. Grafova's loans at all, even though they appeared on FZC's financial statements. *E.g.*, (Def.'s Ex. 32, 2017 Financial Statement; Pl.'s Ex. 7, 2020 Financial Statement). Nor does it refer to any legal principles supporting the suggested "sequence" that ignored payment of a legal debt. The email does advise determining the "correct amounts [owed] to *Director* [Koster]," but that instruction did not include determining the amounts owed to Ms. Grafova because Mr. Koster

15

ousted her as a director five months earlier. (Pl.'s Ex. 53). So the court finds that Euroboor and Mr. Koster's reliance on APT did not sanitize their conduct.

Around the same time, Euroboor MEEBS began its operations in late December 2018. (Pl.'s Ex. 64). The Euroboor entities include companies in five countries (USA, China, Russia, Netherlands, and UAE). Notably, Mr. Koster admitted that the UAE is the only country with two Euroboor entities: Euroboor FZC and MEEBS. In fact, beginning in February 2019, MEEBS began operating out of the same space that Euroboor FZC previously occupied; Euroboor FZC merely rented the space to MEEBS. (Pl.'s Ex. 53). But the exchange reflects only part of the complete overlap between Euroboor FZC and MEEBS.

Mr. Shahzad also testified that Euroboor FZC sold nearly all of its inventory to Euroboor MEEBS in May 2019, shortly after MEEBS began its operations. *See* (Def.'s Ex. 165). He admitted that MEEBS paid Euroboor FZC roughly 2 million AED for inventory valued at around 3 million AED. That transaction resulted in a confusing trail of payments and credit notes between Euroboor FZC and MEEBS, in both AED and United States Dollar transactions. *See* (Def.'s Ex. 165, 149, 150). Mr. Shahzad claimed that APT Consultants advised these transactions. But from all appearances, MEEBS merely replaced Euroboor FZC while buying its inventory at below-market costs.

The overlap of employees at both companies also indicates MEEBS's replacement of Euroboor FZC. In February 2019, Euroboor FZC terminated seven employees, including Rehman Shahzad and Tulsidas Gawande, a financial manager for the company. (Pl.'s Ex. 66). On cross-examination about these employees, Mr. Koster recalled that four of the seven immediately began working for MEEBS after their termination, and he could not recall whether the other three did as well. All seven of the employees received "gratuity salary" from Euroboor FZC upon their termination; Shahzad received 2,700 AED and Gawande received 6,200 AED. (Pl.'s Ex. 66). But almost immediately, both those individuals continued providing the same services to MEEBS that they had provided to Euroboor FZC.

Further, it appears that Euroboor FZC and MEEBS serve significantly overlapping clientele: both companies contract with "Adex International," "Al Hejaz Building Materials," "Al Reyami International Steel Tech," "AL Rizq Al Halaal Trading Company," "Al Shirawi Equipment," "Al Zeituna Metal Construction," "Al Bawardi Tools & Hardware," "AMRT Enterprises," "Armour Machinery Repairing," "Automech Steel," and "Ayoki Contracting." *Cf.* (Pl.'s Ex 173, Bates P173-003) *with* (*id.*, Bates P173-018). And that list reflects *only* the business partners whose names start with "A." The overlapping clientele indicates the replacement of Euroboor FZC with MEEBS.

17

Mr. Koster also engaged in shady transactions between himself, Euroboor FZC, and MEEBS to serve his financial goals, while avoiding repaying Ms. Grafova. For example, Mr. Shahzad testified that Mr. Koster loaned capital funds to start MEEBS, but on cross-examination he admitted that he did not know whether documents evidencing those loans existed. And in a disturbing December 2018 email, Mr. Shahzad discussed the Euroboor company's practice of "issuing intercompany sales invoices"—i.e., of transferring money among Mr. Koster and his entities at his direction. (Pl.'s Ex. 84). Mr. Shahzad wrote to Mr. Koster: "I want to transfer some money from [Euroboor FZC]'s account to your personal account, which you will pay to MEEBS, after that I will be able to pay to [MEEBS's] suppliers." (*Id.*). Mr. Shahzad testified on re-direct that he conducted this transaction in accordance with Mr. Koster's "wishes."[4] Had Mr. Koster not wanted to hide the transfer of funds from Euroboor FZC to MEEBS, Mr. Shahzad would have no reason to first transfer funds from Euroboor FZC to Mr. Koster. So it would appear that MEEBS's funds came directly from Mr. Koster. In other words, Mr. Koster treated his personal account and the corporate accounts of Euroboor FZC and MEEBS as interchangeable vessels in a financial shell game among the entities.

---

[4] Importantly, the email also notes that "same has been discussed with Mr. Noor [of APT Consultants], and he is agreed as well." (Pl.'s Ex. 84). APT's rubber-stamping this shady financial practice casts further doubts on the accuracy of any advice from APT that Euroboor purportedly relied on.

Viewed together, the evidence and testimony indicated that Mr. Koster directed the simultaneous wind-down of Euroboor FZC and the creation of the nearly-identical Euroboor MEEBS. That transition included murky transfers of inventory, firing and re-hiring of over half of Euroboor FZC's staff, and MEEBS's operating out of Euroboor FZC's own office space. And Mr. Koster's alleged reliance on APT Consultants hurts, rather than helps, his case because he knowingly failed to provide APT with key information about Ms. Grafova's loans, her claims in this case, and this court's summary judgment in her favor—matters that affect the legality of transfers of assets.

### iii.    Euroboor FZC's Debt Payments and Write Offs

At the hearing, the parties also introduced evidence of Euroboor FZC's decision to pay its other debts and write off debts owed it, despite not paying Ms. Grafova.

One such debt was $1.23 million that Euroboor USA owed to Euroboor FZC. Mr. Koster and Ms. Abraham (Euroboor USA's general manager) testified that Euroboor USA owed debts to Euroboor FZC as its supplier. But Euroboor USA suffered yearly financial losses from its start until 2020, preventing it from paying off those debts. On April 2, 2019—less than nine months before Ms. Grafova's loans became due—Euroboor FZC's "board of directors" (i.e., Mr.

Koster) decided to write off the $1.23 million debt that Euroboor USA owed to

FZC. (Pl.'s Ex. 98).

The court finds Euroboor FZC's forgiving Euroboor USA's debts

problematic for two reasons. First, the court has already explained that Mr. Koster

ousted Ms. Grafova on July 4, 2018, leaving him as the sole director on Euroboor

FZC's "board" in April 2019 when the board decided to write off $1.23 million in

debts. If Euroboor USA had somehow paid that debt to Euroboor FZC, then

Euroboor FZC could have later paid Ms. Grafova, but Mr. Koster prevented that

series of events by forgiving the debt.

And second, Mr. Koster and Mr. Shahzad testified that Euroboor FZC

forgave the $1.23 million debt at the guidance of APT Consultants. But the only

documentary evidence of any such advice is an email from APT to Mr. Shahzad,

dated May 23, 2019—over a month *after* Euroboor FZC's "board" decided to erase

the debt. (Pl.'s Ex. 57). And the court has already discussed its concerns with Mr.

Koster and Euroboor's reliance on APT's advice, while withholding key

information from APT. So the court finds little credibility to the testimony that

Euroboor forgave debts in April 2019 based on uninformed guidance that APT did

not provide until May 2019. Rather, the court finds that Euroboor FZC's payment

of debts and debt write offs indicates its efforts to thwart Ms. Grafova's ability to

collect the debt owed to her.

iv.    **Payments from Euroboor FZC to Mr. Koster Personally**

Ms. Grafova also presented evidence that Euroboor FZC made a staggering number of payments *directly to Mr. Koster* in the months shortly before the maturity date of the loans on December 31, 2019.

For example, Euroboor FZC made ten transfers to Mr. Koster's personal bank account in the months from January to June 2019. (Pl.'s Ex. 23). These transfers totaled roughly $1.32 million; seven of them were for exactly $135,000.00. On cross-examination, Mr. Koster admitted that he essentially "paid himself" with these transfers, and he offered no other explanation for their conspicuously identical amounts.

Likewise, in May 2019, Euroboor FZC paid Mr. Koster three "royalty" payments of $100,000.00 each. Euroboor's records indicate these payments covered Mr. Koster's 2016 royalties (Pl.'s Ex. 92), 2017 royalties (Pl.'s Ex. 93), and 2018 royalties (Pl.'s Ex. 94) from Euroboor FZC. Mr. Koster offered no explanation for why Euroboor FZC had delayed in paying those royalties until the end of the 2019 fiscal year—the same year that Ms. Grafova's loans became due.

This pattern has not stopped: Euroboor FZC's May 31, 2021 income statement shows that Mr. Koster received a 2021 salary of 528,000 AED (nearly $144,000 USD). (Pl.'s Ex. 31). Mr. Koster also received $12,000 per year as "remuneration" for serving as Euroboor FZC's director. (Pl.'s Ex. 33). These

21

payments raise perplexing questions, especially in light of Euroboor FZC's defense that it does not have assets to pay anything to Ms. Grafova.

The court estimates that these payments to Mr. Koster *total nearly $2 million*—well over the amount of principal and interest Euroboor FZC owed Ms. Grafova on December 31, 2019. Those payments, which occurred in the months around the time Ms. Grafova's loans became due through at least 2021, undercut any argument that Euroboor FZC did not have the assets to repay Ms. Grafova.

Still, Mr. Koster cites several cases in his brief that he argues support "drastically mitigat[ing] the penalty." (Doc. 338 at 10). The court finds all of these cases distinguishable for a single reason: none of them concerned a situation where, as here, the party breaching the contract continued to breach after a court ordered that the party was in breach and set forth steps by which the party could cure the breach. This court issued such a ruling on September 23, 2021, when it found that Euroboor FZC breached the two loan contracts and owed at least the principal and compounded quarterly interest on the loans and set forth that amount. (Doc. 231). Even so, Euroboor continued refusing to pay anything to Ms. Grafova.

Also, the non-breaching parties in Mr. Koster's cited Dutch cases either failed to prove an aspect of the breach claim (*Easystaff* case, doc. 292-2; *Plaintiff*, doc. 292-5), failed to prove damages (*Foekens* case, doc. 292-4), or failed to prove an "intentional breach of contract" (*VOF* case, doc. 292-3). The court has found

that Ms. Grafova proved each of those issues here—most disturbing is the continued intentional refusal to pay the legal debts owed to Ms. Grafova even after the court found Euroboor FZC had breached the loan contracts. So the court finds little relevant guidance from Mr. Koster's Dutch authority.

In sum, the evidence above addresses the Dutch law factor of the "circumstances under which the penalty clause was invoked"—that is, Ms. Grafova's repeated requests for payment beginning in November 2017 and Euroboor and Mr. Koster's willful refusal to pay her, despite Euroboor FZC's making significant payments to Mr. Koster and transferring many of its assets to its successor, MEEBS.

The evidence also touches on the Dutch law factor of the "purpo[se] of the penalty clause"—that is, to deter Euroboor FZC's *willful* non-payment of Ms. Grafova's loans. But before setting a penalty amount, the court will explain the evidence supporting Ms. Grafova's veil-piercing allegation because much of that evidence will also inform the court's penalty determination.

### III.   Piercing Euroboor FZC's Corporate Veil

The parties stipulate that UAE law governs the veil-piercing allegation. That law provides that a business owner may face personal liability if he uses an LLC to

"drive a personal agenda."[5] (Doc. 290 at 9) (quotation omitted). An owner drives a personal agenda when his acts both result in harm to third parties, and the acts "were deceitful and culminate in what could be characterized as a gross mistake." (*Id.*). Managers of LLCs may also face personal liability when they "fail to act within the statutory duty of care," act fraudulently, or "abuse the protection afforded by" the LLC's limited-liability status. (*Id.*). As explained below, the court finds Mr. Koster's conduct meets this standard for personal liability.

The parties did not provide any UAE case law that would help the court flesh out these principles. So, although not controlling as to the court's findings under UAE law, the court consults Alabama case law.

In an analogous case, the Alabama Supreme Court affirmed the lower court's decision to pierce the corporate veil against a business owner who "dissolved" his solely-owned corporation to avoid paying for a court judgment issued against it based on breach of contract. *Cohen v. Williams*, 318 So. 2d 279 (Ala. 1975). Despite ceasing the corporation's operations, the owner continued to borrow money on the corporation's insurance policy and pay other debts of the corporation, while refusing to pay the judgment against the company. *Id.* at 280.

The analysis of *Cohen* applies to Mr. Koster's conduct here:

---

[5] Testimony at the hearing confirmed that Euroboor's designation as an "FZC" company equates to "LLC" status under American business law principles.

> Because of [the owner]'s "dissolution" of the corporation, there were
> no assets from which the judgment could be collected. [The owner]
> personally assumed liability for all corporate debts except the
> judgment. By the "dissolution" he sought to evade the judgment.
> These are precisely the type of acts which a court in the exercise of its
> inherent equitable powers may view to differentiate the [LLC] form
> from the substance.

*Cohen*, 318 So. 2d at 281.

Here, the court has already touched on Mr. Koster's conduct in assuming sole directorship of Euroboor FZC, dissipating its assets, and receiving personal transfers from Euroboor FZC. In addition to informing the penalty analysis, that conduct indicates that Mr. Koster "abused the protection afforded by" Euroboor FZC's corporate form for his own purposes in his war with Ms. Grafova and to avoid paying the debt owed to her. *See* (doc. 290 at 9, citing UAE law). So that conduct supports piercing Euroboor FZC's corporate veil as well.

The court also finds that Ms. Grafova may pierce the corporate veil because Mr. Koster consistently transferred funds among the entities and to himself and created loans between himself and the other Euroboor entities. For example, Ms. Grafova presented evidence of numerous loans between Mr. Koster and Euroboor FZC. *E.g.*, (Pl.'s Ex. 127, loans totaling $215,590.63 in May 2018). And the court has already discussed the December 2018 email in which Rehman Shahzad proposed transferring funds from Euroboor FZC to Mr. Koster's "personal account, which you will pay to MEEBS, after that I will be able to pay [MEEBS's]

suppliers." (Pl.'s Ex. 84). As explained above, this kind of transaction often occurs when businesses try to hide their assets from creditors. *See Cohen*, 318 So. 2d at 281.

The court has also discussed Mr. Koster's efforts to write off or pay Euroboor FZC's debts, except for those owed to Ms. Grafova. This practice resembles the owner's efforts to pay off the company's debts in *Cohen*, while draining the company's funds to prevent repayment of the judgment against it. *See Cohen*, 318 So. 2d at 281. And of course, this court issued a judgment in Ms. Grafova's favor in September 2019, just as in *Cohen*; but Mr. Koster continued to siphon funds away from Euroboor FZC even after that time to avoid repaying Ms. Grafova.

Also, invoices reflect that one Euroboor entity would often pay for Mr. Koster's expenses related to another Euroboor entity, resulting in a confusing trail of invoices and payments between companies. (Def.'s Ex. 146). Ms. Grafova presented evidence that as recently as 2021, Mr. Koster continued to pay for the Euroboor entities' rents, attorney's fees, and other expenses through transfers involving his personal accounts and unexplained "dividends." (Pl.'s Ex. 190). These transfers reflect Mr. Koster's abuse of Euroboor FZC's distinct corporate identity. *See* (doc. 290 at 9, citing UAE law).

The court also finds that Mr. Koster likely violated UAE corporate law—another relevant factor for veil-piercing under UAE law. On cross-examination, Ms. Grafova's counsel walked Mr. Koster through several provisions of UAE corporate law. *See* (Pl.'s Ex. 17 and accompanying testimony). For example, Article 49 of UAE corporate law prohibits one shareholder from exercising any duties beyond "ordinary management tasks" without approval from the company's other shareholders. *See* (Pl.'s Ex. 17 at Bates P017-011). But Mr. Koster unilaterally decided to terminate most of Euroboor FZC's employees in 2019. *See* (Pl.'s Ex. 66). Taking that action without Ms. Grafova's approval as a shareholder likely violated Article 49.

Likewise, Mr. Koster's unilateral decision to forgive $1.23 million in debt that Euroboor USA owed to Euroboor FZC in April 2019 likely violated Article 49 because he did not seek approval from Ms. Grafova, the only other shareholder. *See* (Pl.'s Ex. 98). And his unilateral decision to terminate Ms. Grafova as a director without her approval as a shareholder indicates a similar violation.

Mr. Koster's testimony also indicates that he likely violated—or at least acted without knowledge of—the provisions governing corporate liquidation. *See* (Pl.'s Ex. 17 at Bates P017-055). For example, UAE law requires a company undergoing liquidation to appoint a liquidator by decision of the General Assembly (i.e., board of directors). (*Id.*, Article 308). But when asked about these provisions,

Mr. Koster admitted that he did not know they existed, and he provided no evidence that he attempted to comply with them. The court finds this evidence to support piercing the veil because it shows Mr. Koster's failure "to act within the statutory duty of care." (Doc. 290 at 8, citing UAE law).

On the topic of Euroboor FZC's liquidation, the court notes a troubling email exchange that began when Ms. Grafova sent Mr. Koster a renewed request to pay the loans' principal and interest in December 2018. (Pl.'s Ex. 60). Euroboor FZC's CFO forwarded Ms. Grafova's request to Euroboor's legal advisor, and Mr. Koster requested a meeting with the advisor to discuss possible solutions. In response, the advisor sent Mr. Koster legal advice addressing potential avenues to "liquidate the Company." (*Id.* at Bates P060-002). This email chain directly links Ms. Grafova's efforts to recover for her loans (the first email in the chain) with Mr. Koster's efforts to prevent her recovery by liquidating Euroboor FZC.

Overall, this evidence aligns with Mr. Koster's threat to Ms. Grafova in a restaurant in November 2017 that he would "empty the company" to prevent her from recovering on the loans. (Def.'s Ex. 71). And it aligns with Mr. Koster's testimony that he viewed the events following Ms. Grafova's decision to accelerate the loans as a "war." He manipulated Euroboor FZC's assets to win battles in that personal war against Ms. Grafova. So the court will grant Ms. Grafova's request to

pierce Euroboor FZC's corporate veil to hold Mr. Koster personally liable for any judgment against it.

## IV.   **The Amount of Penalties**

Having fully addressed the relevant evidence from the hearing, the court turns to the appropriate amount of penalties to impose. As explained above, the court will impose $90,000 in penalties under the loan agreements for Euroboor FZC's quarterly breaches in failing to pay the quarterly interest that Ms. Grafova requested beginning in December 2017, and for failing to pay the loans' balances when they became due on December 31, 2019 (nine breaches times $5,000 per loan: 9 x $5,000 x 2 = $90,000).

The court also finds an additional penalty appropriate for Mr. Koster and Euroboor FZC's deliberate and intentional refusal to pay Ms. Grafova after September 23, 2021, when the court issued its summary judgment ruling specifically finding that Euroboor FZC owed her the loans' principal and interest. (Doc. 231). The loan agreements provide for a $500 daily penalty until paid in full, but the court has found that amount to be unreasonably high when measured from the December 31, 2019 due date. (Doc. 231 at 24).

Unfortunately, the parties provided little helpful guidance as to a reasonable penalty in their post-hearing briefs: Ms. Grafova again sought the $500 daily penalty that this court already found to be unreasonable (albeit with a more limited

time frame), and Mr. Koster asked the court to award *no penalties* for the period

since the court's summary judgment ruling in September 2021. *See* (Doc. 337 at

11; doc. 338 at 3).

The court rejects those proposals and instead, adopts a penalty provision

familiar to Mr. Koster and the Euroboor entities. The court will impose a penalty

of 9% interest compounded annually, calculated from September 23, 2021 (the

date this court found Euroboor FZC obligated to pay the loans' principal and

interest) until the date of this final judgment, August 1, 2022. Mr. Koster should

not object because the court derives this 9% penalty figure from Euroboor's inter-

company dealings—namely, the "settlement agreement" between Euroboor FZC

and Euroboor BV concerning their trademark dispute. That agreement provided for

"delay penalties at 9% annually as of the date of the judicial claim until payment in

full and fees and expenses." (Def.'s Ex. 139).

In this case, the 9% interest from September 23, 2021, until the final

judgment date of August 1, 2022, results in a penalty of $78,213.82. When added

to the $90,000 quarterly breach penalties, ***Euroboor FZC owes $168,213.82 in***

***penalties***. And when added to the loans' stipulated principal and interest of

$1,023,134.48 (doc. 328), ***Euroboor owes a total of $1,191,348.30***.

The court finds this amount reasonable because the sum total of all penalties

reflect roughly 14% of the total amount owed. That proportion reasonably reflects

the recalcitrance showed by Mr. Koster in his "war" against Ms. Grafova, and the similar penalties in Dutch cases. *E.g.*, (doc. 292-2, *Easystaff* case) (mitigating penalty to 17% of total breach amount without the prolonged recalcitrance seen here).

To be sure, the court's penalty award affords Mr. Koster a small victory in a "battle" that Ms. Grafova's brief raises: the court previously rejected her request to impose a $500 daily penalty and will not change its mind. *See* (Doc. 337 at 11). But Mr. Koster's flagrant refusal to pay Ms. Grafova—despite her repeated requests for repayment and despite this court's order finding Euroboor FZC in breach—ultimately lost him the *war* over Ms. Grafova's loans and requires the imposition of this additional penalty. So now he must pay.

The court finds it appropriate to impose an additional, *contingent* penalty to speed Ms. Grafova's recovery, which she has been seeking before this court for nearly four years. Mr. Koster and Euroboor FZC have two options to avoid the imposition of additional penalties:

1. On the one hand, Mr. Koster and Euroboor FZC may pay Ms. Grafova *in full* for the loans' principal, interest, and penalties now imposed within 30 days of the issuance of this opinion without incurring any additional penalties or additional contractual interest[6]: i.e., full payment of $1,191,348.30 no later than August 31, 2022;

---

[6] In essence, the court suspends the incurrence of contractual interest during the 30-day period to encourage repayment of the debt. If not paid within this 30-day grace period, contractual interest will again accrue.

2. *Alternatively*, Mr. Koster and Euroboor FZC may work with Ms. Grafova to develop a *reasonable* payment plan to fully repay the loans' principal, interest, and penalties over a limited, specified time period. If the parties cannot agree on a reasonable payment plan, the parties shall submit their positions about such a plan to the court no later than thirty days from the issuance of this opinion; the court will then determine a reasonable and binding payment plan.

The court notes that the contractual interest of six percent compounded annually continues to accrue (after the 30-day grace period) until the loans are fully paid, even if Euroboor enters a payment plan. But Euroboor's failure to *either* make full payment within 30 days *or* to agree to a reasonable payment plan (or to submit its contested proposals to the court for a plan) within 30 days will trigger an *additional* daily penalty of $250 per day, per loan. This figure represents a one-half reduction of the loans' $500 daily penalty. The court finds the imposition of this mitigated contractual penalty reasonable under Dutch law in light of the recognized purpose of contract's penalties to encourage payment and to punish for failure to do so. Precisely because the daily penalty punishes Euroboor FZC and Mr. Koster for continued nonpayment, the court finds it appropriate as a *contingent* penalty if the Defendants continue to deliberately, intentionally, and flagrantly refuse to pay.

So if Euroboor FZC and Mr. Koster fail (1) to make full payment of the loans' principal, interest, and penalties ***by August 31, 2022***, *OR* (2) enter a payment plan ***by August 31, 2022***, a penalty will begin to accrue at the rate of ***$500 daily*** ($250 per loan, per day) on the entire sum of the loan's principal, six percent

contractual quarterly interest, and penalties awarded by this court. That penalty—along with contractual interest—will continue to accrue until Defendants pay the loans' principal, interest, and penalties *in full*.

Finally, the court notes that Ms. Grafova argues in her final brief that the court should "depart from the liquidated point system and award Ms. Grafova all of her attorney's fees, expert fees, and costs post-September 23, 2021." (Doc. 337 at 14). The court declines to address this argument now because it has ordered that Ms. Grafova could renew her request for attorney's fees and present any relevant arguments by a *separate* filing after the court issues this opinion. *See* (doc. 290 at 11; doc. 334).

The court will enter a contemporaneous order reflecting these rulings.

**DONE** and **ORDERED** this 1st day of August, 2022.

*Karon O. Bowdre*
_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE